GEORGE CARDONA
United States Attorney
WAYNE GROSS
Assistant United States Attorney
Chief, Santa Ana Branch Office
ANDREW STOLPER (205462)
Assistant United States Attorney
     411 West Fourth Street, 8th Floor
     Santa Ana, CA  92701-4599
     Telephone:  (714) 338-3536
     Facsimile:  (714) 338-3708
     Andrew.Stolper@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


                 UNITED STATES DISTRICT COURT

             FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,    ) No. SA CR 05-36-JVS
                             )
          Plaintiff,         ) **GOVERNMENT'S SENTENCING POSITION**
                             ) **FOR DEFENDANT KENNETH KETNER;**
          v.                 ) **DECLARATION OF ANDREW STOLPER**
                             )
KENNETH KETNER               )
                             )
          Defendant.         )
                             )
_____)

     Plaintiff United States of America, by and through its

attorney of record, Assistant United States Attorney Andrew

Stolper, hereby files its sentencing position for defendant

Kenneth Ketner ("defendant").  The government's position is based

upon the attached Memorandum of Points and


///

///

///

Authorities, the files and records in this matter, the

declaration of Andrew Stolper, as well as any evidence or

argument presented at hearing on this matter.

DATED: April 23, 2007          Respectfully submitted,

                               GEORGE CARDONA
                               United States Attorney

                               WAYNE GROSS
                               Assistant United States Attorney
                               Chief, Southern Division


                               _____/S/_____
                               ANDREW STOLPER
                               Assistant United States Attorney

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . .  ii

MEMORANDUM OF POINTS AND AUTHORITIES  . . . . . . . . . . .  3

I.   **GOVERNMENT'S POSITIONS**  . . . . . . . . . . . . . . . .  4

     A.   Factual Background  . . . . . . . . . . . . . . .  4

          1.   Before MCR . . . . . . . . . . . . . . . . .  4

          2.   MCR  . . . . . . . . . . . . . . . . . . . .  5

          3    After MCR  . . . . . . . . . . . . . . . . .  8

     B.   Defendant Breached the Plea Agreement  . . . . . .  13

     C.   Probation Officer's Calculations  . . . . . . . .  16

          1.   Offense Level Calculations  . . . . . . . .  16

          2.   Leadership and Abuse of a Position of Trust . .  16

     D.   A Sentence of 135-168 Months Is Well Justified  . .  17

i

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Defendant Kenneth Ketner ("defendant") stands convicted of one count of wire fraud in violation of 18 U.S.C. § 1343 and one count of money laundering in violation of 18 U.S.C. § 1957. Defendant's convictions are the result of guilty pleas taken before this Court on August 1, 2006.

Paragraph 15 of the plea agreement requires defendant, "within six months of entering a guilty plea" to file with the IRS "Federal income tax returns for tax years 2001 through 2005, to pay any amounts due and owing (including penalties), and to comply with all rules and regulations of the IRS." Stolper Decl. Ex. A. Defendant's tax returns, and payments, were due February 1, 2007. Defendant filed his tax returns on February 6, 2007. Defendant owes approximately $601,000, including interest and penalties, to the IRS. Beginning on April 10, 2007, after the government told defendant it was going to move for a breach, defendant started paying his taxes. Since that date, defendant has paid approximately $361,452.56. As of April 23, 2007, defendant still owes approximately $239,736.32 to the IRS. At the time of sentencing, the government will request the Court find that defendant knowingly violated and failed to perform his obligations under the plea agreement, that it declare a breach,

1  and that it relieve the USAO of its obligations under plea

2  agreement.[1]

3       The Probation Officer Pre-Sentence Report ("PSR") calculates

4  defendant's offense to be 31: 28 points based on the loss

5  resulting from the offenses, 4 points for organizing and leading

6  the offense, 2 points for stealing more than $1 million from a

7  financial institution, less three for acceptance of

8  responsibility.

9       Assuming a breech, it is the government's position that the

10 PSR is correct and defendant's total offense level is 33 with an

11 advisory guideline range of 135-168 months.  Defendant's has been

12 involved with some variety of fraud from before MCR until well

13 after his indictment.  A sentencing range of 135-168 months is a

14 fair and reasonable sentence for defendant.

15                              **II.**

16                    **GOVERNMENT'S POSITIONS**

17 A.   <u>Factual Background</u>

18      *1.   Before MCR*

19      Defendant's real-estate fraud began before Mortgage Capital

20 Resources ("MCR").  In the early 1980s defendant worked as a

21 branch manager for GMAC Mortgage in Riverside, California.

22 Stolper Decl. Ex. B.  According to Tami Ruffoll, an employee of

23 defendant, defendant instructed her to prepare fraudulent VA Form

24 and rent receipts to enable borrowers to qualify for loans.  <u>Id</u>.

25 _____

26      [1]   This sentencing position assumes that the Court will
   find that defendant breached the plea agreement.  In the event
   the Court does not so find, the government will stand by its
27 recommendations in the written plea agreement and the arguments
   contained in this filing should serve as the basis for a high-end
28 sentence under the plea agreement.

Ms. Ruffoll reported this fraudulent conduct to GMAC's main office.  Id.  Three weeks later, she observed defendant being escorted out of the building.  Id.  On his way out, defendant threatened Ms. Ruffoll's life.  Id.

By 1990, defendant was head of California Mortgage Corporation ("CFC").  Stolper Decl. Ex. C.  Defendant hired Roberta Martin to be a loan processor, and then made Ms. Martin his assistant.  Id.  In the mid 1990s defendant asked Ms. Martin to serve a the figure-head president of CFC.  Id.  Defendant then started MCR.  Id.  Shortly after Ms. Martin became "President," CFC declared bankruptcy.  Id.  After the bankruptcy, the Department of Housing and Urban Development ("HUD") conducted an audit and discovered that many of CFC's HUD insured loans were fraudulent.  Id.  Because Ms. Martin was the "president" of CFC, she was held responsible by HUD for over $200,000 worth of losses.  Id.  Defendant agreed to make the payments to HUD on Ms. Martin's behalf.  To assure that defendant made those payments, Ms. Martin followed defendant to MCR as his personal assistant.  Id.

   2.  MCR

Defendant was in control of MCR throughout its existence.  PSR ¶ 15.  Defendant was responsible for two fraud schemes taking place simultaneously at MCR.  First, defendant orchestrated what has become known as the "Purple File Property" scheme.  PSR ¶¶ 19-24, Stolper Decl. Exs. B-F.  MCR was a mortgage company that funded loans using warehouse lines of credit.  Id.  These warehouse lines of credit allowed MCR to fund loans to borrowers using these lines of credit for a short term, usually 60 days.

5

1  Id.  Most loans that were funded with the warehouse line of
2  credit were going to packaged and sold to warehouse lenders.  Id.
3  For the warehouse lender to purchase the loan it had to meet
4  certain specific criteria.  Id.  For example, loans that were in
5  default would not be purchased by the warehouse lenders.  Id.
6  For loans in default, MCR would have to foreclose on the loan
7  itself or try to find an alternate buyer for the loan, often at
8  an economic loss.  Id.  Properties that mortgage company
9  forecloses on are known in the industry as "real-estate owned" or
10 "REO." Id.

11      Defendant did not wish for MCR to take losses by foreclosing
12 on properties.  Id.  Instead, defendant's scheme had his friends
13 and family[2] pretend to buy the properties from MCR, and borrow
14 money from MCR to do so.  Id.  MCR would then originate a new
15 loan for the straw buyer.  Id.  This would give defendant another
16 60 days, generate additional loan origination fees for MCR, and
17 prevent MCR having to take a loss on these loans.  Id.  In total,
18 defendant orchestrated hundreds of these transactions employing
19 as straw buyers his employees, in-laws, friends, and the co-
20 defendant, Allen Johnson.  Id.

21      The second scheme defendant orchestrated at MCR was to steal
22 warehouse lenders' money.  PSR ¶¶ 25-34, Stolper Decl. Exs. B-F
23 When MCR would originate a loan it would request funding from the
24 warehouse lender.  Id.  The warehouse lender did not wish to send
25 funds directly to MCR.  Id.  Instead, the warehouse lenders sent

26
27      [2]    Defendant's straw buyers include his wife's parents,
   mistress's parents, Alan Johnson, Victor Boyd (who submitted a
   letter in support of defendant's character), and Paul Olivera
28 (discussed further below).

the money to either an escrow company or an attorney to act as a closing agent.  Id.  This third-party closing agent was supposed to confirm that the loan agreements were proper, and the warehouse lender's security interest in the property was established, only then release the warehouse lenders funds to the borrower and dispersing some of the funds to MCR as a fee.  Id.

Rather than use a third-party as the escrow agent, defendant put Allen Johnson, a recent law-school graduate and friend of his, in place as the escrow agent for MCR.  Id.  Defendant paid-off Johnson to abdicate his fiduciary duties and forward the warehouse lenders directly to MCR.  Id.  In some cases, MCR would fund the loans as Johnson should have.  Id.  In many others, Ketner would take the warehouse lender's money and use it to pay MCR's expenses, including expenses relating to defendant's extravagant lifestyle.  Id.  As evidence of Ketner's direct control over the money in Johnson's trust account, Ketner had funds wired from that account directly to Ferrari of Orange County to pay for a new sports car.  Id.

To conceal his fraudulent activities, defendant, along with Johnson and others, set up a series of off-shore accounts to launder some of the fraudulent proceeds.  PSR ¶ 41-48, Stolper Decl. Ex F.  Defendant set up a bank account in Nevis, in Luxembourg, and in Nevada in the name "Paul Hernandez" using a fake identification provided by Paul Olivera.  Id. and Stolper Decl. Ex. G.  Defendant would then wire money around the world so it could arrive at his Nevada for him to spend.  PSR ¶¶ 41-48.

Defendant was using warehouse lender's money to pay for MCR's, and his own personal, expenses.  As a result, the checks

MCR was writing to its borrowers were bouncing.  PSR ¶¶ 30-34,
Stolper Decl. Exs. C-F.  In response, defendant directed Roberta
Martin and Terry Stone (a paralegal who worked for MCR) to use
money that warehouse lenders were forwarding to Allen Johnson to
fund new loans to be diverted to replace the money defendant
embezzled and fund old loans.  _Id._  This created a Ponzi scheme,
except instead of using new investor's money to pay back old
investors, defendant was using new loan money to make good on old
loans.

Like all Ponzi schemes, defendant's collapsed under its own
weight.  Defendant's creditors, particularly Household Bank,
learned what was going on and shut off MCR's money flow.  This
forced MCR, and defendant, into bankruptcy.  Defendant, and his
wife, filed for bankruptcy in December, 2000.  Stolper Decl. Ex.
H.

   *3.   After MCR*

Bankruptcy did not, however, end defendant's fraudulent
schemes.  The "Purple File Properties" had straw owners that
defendant had put in place to "own" dozens of properties around
the southland.  For example, defendant used Pamela Stewart
(defendant's mistress) to be the straw owners of 14311 Weeping
Willow Lane in Fontana and 2856 N. Supelveda Ave., San
Bernardino, in May 2000 (seven months before defendant declared
bankruptcy).  Stolper Decl. Ex. H.  According to Pamela Stewart
(defendant's mistress), defendant controlled every aspect of
these properties, made all payments for the properties, and had
total control over the properties.  _Id_.  Defendant did not,

8

however, list these properties as owned by him on his bankruptcy schedules.  Stolper Decl. Ex. H.

After defendant emerged from bankruptcy, he began to sell off the "Purple File" properties that defendant parked in his friends and family's names.  For example, according to Ms. Stewart, defendant sold off 14311 Weeping Willow Lane in Fontana in December 2001.  Stolper Decl. Ex. H.  Although property was owned, in name, by Ms. Stewart's parents, defendant directed that Ms. Stewart forward the sales proceeds for that property to defendant, which she did.  Id.  In 2004, defendant sold the 2856 N. Supelveda Ave., San Bernardino, property.  Id.  He did so without consulting Ms. Stewart's parents, the titular owners of the property, and directed that the proceeds be paid to defendant and Ms. Stewart's business.  Id.  In response to the government investigation of this transaction, defendant had Ms. Stewart sign backdated promissory notes to make it appear as though the payments to defendant were loans opposed to proceeds of defendant's bankruptcy fraud.  Id.[3]

Defendant's bankruptcy did not wipe out his debt to a number of his victims.  Surviving defendant's bankruptcy were nondischargable judgements from Household Bank ($5,000,000), Regions Bank ($750,000), and Commerce Title ($400,000), and Conseco ($775,000), and others.  Stolper Decl. Ex. J.  In total,

---

[3]    According to Beverly Fleming, a long-time employee of defendant, she was approached by defendant to be a straw buyer of a property on which CFC had foreclosed, years before MCR. Stolper Decl. Ex. D.  Per Ms. Fleming, defendant, much like he did at MCR, kept the REO's out of the CFC bankruptcy, treating them as his own "personal property" thereby denying his creditors the recovery they were entitled.  Id.

1  defendant emerged from bankruptcy with over over $6.9 million in

2  nondischargeable judgments resulting from his MCR fraud.  <u>Id</u>.

3  The judgements, signed by Judge Barr, require defendant to

4  provide his creditors copies of his tax returns, commencing with

5  tax year 2000, until such time as defendant pays down the

6  judgments.  <u>Id</u>.  The bankruptcy judgements against defendant were

7  entered in late 2001 through early 2002.  <u>Id</u>.

8       In November, 2001, while defendant's bankruptcy was ongoing,

9  defendant entered into a "handshake" partnership with Rick

10  Arvielo where defendant would get 50% of the profits from a

11  mortgage company called New American Financial in return for

12  defendant's services.  Stolper Decl. Exs. I and K.  Defendant

13  requested that Mr. Arvielo not pay him direct W-2 wages.  <u>Id</u>.

14  Instead, defendant requested that Mr. Arvielo pay "NFC

15  Consultants, Inc." or "Danbury Consultants."  <u>Id</u>.  These were

16  straw-companies set up and controlled by defendant but held in

17  the names of defendant's daughter and step-daughter.  Stolper

18  Decl. Exs. L-N.  According to defendant's daughter and Ms.

19  Stewart, "NFC" stands for "no fucking choice," because defendant

20  felt he had no choice but to set up these shell companies, lest

21  he have to pay his victims the money he owes them.  Stolper Decl

22  Exs. I and L-N.

23       Mr. Arvielo complied with defendant's wishes.  From

24  November, 2001 through May, 2004, Mr. Arvielo paid defendant's

25  straw companies over $3.5 million.  Stolper Decl. Exs. I and K.

26  During this same time period, defendant filed no tax returns,

27  paid no personal income tax, and paid his creditors nothing.

28       In addition to setting up Danbury and NFC to deprive

10

defendant's creditors any chance of collecting any money (not to mention the IRS), defendant also set up a straw owner for his new home in Newport Beach.  Defendant recruited Paul Olivera, who previously served as a straw buyer for defendant's "Purple File" properties, was defendant's bookie, and who provided defendant with a fake identification to set up a Nevada bank account to receive the proceeds of his laundered MCR money, as the "purchaser" of 22 Cape Danbury in Newport Beach for over $1.1 million.  Stolper Decl. Ex. G.  Mr. Olivera completed the purchase in on March 26, 2001.  Stolper Decl. Ex. O.  The evidence makes it clear that defendant is the true owner of this house: defendant decided to purchase it; defendant makes the mortgage payments (initially $6,400); defendant decided when it was time to refinance the house to reduce the mortgage payment to $4,400; and defendant lives in the house; and defendant could not provide any rental agreement for the house.  PSR ¶¶ 160-162, Stolper Decl. Ex. G.  Finally, in June, 2006, defendant's criminal attorneys took $149,900 deed of trust on this property, presumably for legal fees for defendant.  Stolper Decl. Ex. O.

    3.  *Post-Indictment*

    The grand jury indicted defendant February 16, 2005 for defendant's MCR-related fraud.  The investigation of defendant's tax evasion, however, continued after indictment.  As part of that investigation, the grand jury subpoenaed Danbury Consultants and NFC for all documents in their custody or control.  In response to that subpoena, defendant, through his previous

11

counsel, produced 89 promissory notes.  Stolper Decl. Ex. P.[4]  In these promissory notes, defendant (60 times) and his wife (29 times) "borrowed" money from these corporations and, in turn, used this money to live on.  Stolper Decl. Ex. P.

Because defendant was borrowing the money, so the argument, goes, he need not pay taxes on the money he is receiving from these companies that he controls.  These promissory notes appeared highly suspicious, as if they were prepared in response to the grand jury subpoena.  This suspicion was compounded by the fact the owners of these corporations (defendant's daughter and step daughter) had no knowledge that their corporations were loaning defendant money.  On March 9, 2005, the grand jury subpoenaed Danbury Consultants and NFC for the <u>original</u> promissory notes so the grand jury could confirm whether defendant and his wife executed these promissory notes after the fact in an attempt to obstruct the grand jury investigation.  Stolper Decl. Ex. Q.

In response to this demand, defendant's counsel informed the government that defendant could not locate the original subpoenas.  <u>Id</u>.  Government counsel, on behalf of the grand jury, then directed the custodians of record for Danbury and NFC to appear before the grand jury to testify how these records were, or in this case, were not maintained.  <u>Id</u>.  Defendant's previous counsel informed the government that defendant was the only person who could testify as custodian of records and that he was

---

[4]     It should be noted that defendant also backdated promissory notes to make a transaction appear legitimate in conjunction with the Purple File properties.  Stolper Decl. Ex. I.

1  going to refuse to so on the basis of his 5th Amendment rights.

2  Id.

3      Defendant also attempted to obstruct justice with regard to

4  the "straw buyer" transactions involving Ms. Stewart's parents.

5  Stolper Dec. Ex. I.  According to Ms. Stewart, the money that

6  went from the properties owned by her parents, but controlled by

7  defendant, was provided to defendant as a loan.  Id.  This was

8  the position that Ms. Stewart took when she was first interviewed

9  by the FBI and IRS-CID.  Id.  The government subpoenaed Ms.

10  Stewart's company to see there was a loan agreement and one was

11  produced.  Id.  In a later interview, Ms. Stewart confessed that

12  defendant gave her this loan agreement and backdated so it would

13  appear to be contemporaneous documentation - rather than created

14  after the fact in response to the government's investigation.

15  Id.

16  B.  Defendant Breached the Plea Agreement

17      Defendant's plea agreement, at page 10, sets forth his

18  obligations.  One of those obligations is:

19      Within six months of entering a guilty plea pursuant to
        this agreement, to file with Internal Revenue Service
20      ("IRS") Federal income tax returns for tax years 2001
        through 2005, to pay any amounts due and owing
21      (including penalties), and to comply with all rules and
        regulations of the IRS.
22

23  Stolper Decl. Ex. A.  Defendant changed his plea pursuant to the

24  plea agreement on August 1, 2006.  His tax returns, and payments,

25  were due to the IRS on February 1, 2007.  Defendant filed his tax

26  returns (albeit a few days late) but neglected to include any

27

28

13

payments for his taxes.  In total, defendant owed the following

taxes, penalties, and interest:[5]

| TAX YEAR | TAXES, PENALTIES, AND INTEREST |
|---|---|
| 2000 | $12,634.52 |
| 2001 | $23,701.67 |
| 2002 | $26,985.03 |
| 2003 | $127,320.92 |
| 2004 | $151,536.65 |
| 2005 | $56,320.83 |
| HomeZippr Trust Fund Recovery | $202,689.26 |
| **TOTAL** | **$601,188.88** |

Stolper Decl ¶ 2.

In early April, counsel for the government informed

defendant's counsel that he had not lived up to his obligations

in the plea agreement and that the government was going to

request the Court declare a breach of the plea agreement.  In

response, defendant rushed to pay some of the taxes that are due

an owing.  On April 10, 2007, defendant paid the taxes due for

2000.  On April 12, 2007, defendant provided the IRS $27,879.  On

April 19, 2007, defendant provided a number of checks drawn on

the account of Paul Olivera.  Id.  On this date, defendant paid

$217,210.00.  On April 20, 2007, defendant paid an additional

$103,729.56.  In total, defendant has been able to raise, and

---

[5]  Nothing in the government's sentencing position should be
construed to mean that the government believes defendant's tax
returns are accurate.

14

pay, approximately $361,452.56 to the IRS.  Defendant has yet to pay approximately $239,700 due to the IRS.[6]

Breaches of plea agreement are addressed beginning on page 11.  If defendant's breach is knowing or willful then the "USAO will be relieved of all its obligations under this agreement" and defendant "will not be able to withdraw his guilty plea."  There is no doubt defendant was well aware of his obligation to file taxes.  Defendant represented to this Court that he "read this agreement and carefully discussed every part of it with my attorney" and that he "understands the terms of this agreement." Moreover, defendant's taxes were a subject of conversation during defendant's interview with the Probation Officer.  According to the PSR, ¶¶ 164 and 165, the Probation Officer inquired about the tax returns, defendant had draft tax returns, but refused to show those drafts to the Probation Officer.

Defendant breached his plea agreement by failing pay the taxes due.  Defendant did file his tax returns but neglected to include payment for any of his taxes going back to 2000.  It is difficult to understand how defendant could believe that he was obliged to file tax returns and but was not required to pay the money owed pursuant to those returns.

Defendant received substantial consideration from the government in the form of sentencing recommendations that are approximately half Probation's recommendation.  In exchange for

---

[6]    According to the IRS, defendant owes an additional $268,124.24 for MCR Trust Fund Recovery.  This amount is under appeal by defendant and as a result has not been included.  This is in contrast to the amount owed for HomeZippr Trust Fund Recovery which was already appealed by defendant and the appeal has been denied by the IRS.

those recommendations, defendant must live up to his obligations under the plea agreement.  Defendant did not fulfill his obligations under the plea agreement.  The government should now, too, be relived from its obligations under that agreement.

C.   Probation Officer's Calculations

    *1.  Offense Level Calculations*

The PSR calculates defendant's loss to be approximately $12.7 million.  The government believes this to be a good, if conservative, approximation.  At the time MCR collapsed, Household undertook a phone audit of the customer who were supposed to have received funds from MCR.  The $9.2 million figure used by probation represents customers who were contacted and affirmatively stated that they did not receive their money.  Probation did not include the 145 customers that Household was unable to reach, which accounts for another $7.2 million in potential loss.  Stolper Decl. Ex. S (Household phone audit spreadsheet, with names and phones numbers of borrowers redacted).

Probation is also correct in calculating that defendant obtained more than $1 million from a financial institution and applying a two-level adjustment.

    *2.  Leadership and Abuse of a Position of Trust*

All accounts place defendant at the top of the MCR fraud.  According Roberta Martin, defendant's assistant, defendant was a micro-manager who controlled every aspect of what was happening at MCR.  Defendant initiated, organized, and ran three schemes simultaneously: the "Purple File" scheme where defendant organized over a dozen straw buyers; the closing agent scheme

16

where defendant paid an attorney to breach his fiduciary duties and launder money around the world; and the MCR scheme where defendant defrauded warehouse lenders and victimized hundreds of borrowers directing a staff of people at MCR to help him carry this scheme out.  Probation's assessment of four levels for defendant's leadership is appropriate.

Defendant also abused his position of trust.  First and foremost, defendant paid an attorney to breach his fiduciary obligations and defraud the warehouse lenders.  Second, defendant breached his warehouse lenders' trust by simply stealing their money to finance MCR and his lifestyle.  Probation's assessment of two level for abuse of trust is also appropriate.

D.   A Sentence of 135-168 Months Is Well Justified

The evidence is clear that, from the early 1980s until *after* defendant was indicted, defendant has been engaging in some kind of fraud.  Defendant's fraud at MCR was extensive in terms of the number of people who defendant had assist perpetrate the fraud, in terms of amount of money misdirected, and in terms of the number of people who MCR disappointed with bounced checks instead of the loan proceeds that they deserved.  Defendant's intent and knowledge is perhaps best evidenced by the international money laundering he engaged in as part of the fraud.  Defendant's long history of fraudulent conduct and the nature of the fraud at MCR are, alone, sufficient to warrant a guideline sentence.

But defendant's misconduct did not end at MCR.  Instead, there is evidence that defendant, after he defrauded MCR's warehouse lenders, cheated them in bankruptcy court by not disclosing the fact that defendant continued to own some of the

17

1    "Purple File" properties.  In effect, defendant defrauded his

2    victims not once, but twice: first by stealing from them; and

3    then by keeping his assets secret during the bankruptcy,

4    collecting the proceeds from their sale secretly on the side.

5         In 2001, as part of the bankruptcy, defendant stipulated,

6    and the bankruptcy court ordered, that defendant provide his tax

7    returns to his victims so that they may enjoy some recovery if

8    defendant prospered after his bankruptcy.  Defendant, to his

9    credit, did prosper.  Defendant has made millions of dollars in

10   the years since the bankruptcy.  But defendant did not honor the

11   stipulations or court orders.  Instead, defendant cheated his

12   victims once again, this time by just not filing income tax

13   returns so his victims were unaware that defendant had the

14   financial ability to start repaying them.  Defendant also set up

15   shell corporations, held by others, to receive payment for

16   defendant's services so defendant could conceal his prosperity

17   from his victims.  And by and setting up shell corporations to

18   evade receiving W-2 income and by failing to file tax returns or

19   pay taxes for over a half-decade, defendant added the United

20   States Treasury to his list of victims.

21        Defendant's misconduct did not cease after he was indicted.

22   Defendant provided 89 promissory notes from Danbury Consultants

23   and NFC to the grand jury.  These promissory notes were intended

24   to make it appear the income defendant was receiving was not

25   income but loans.  This claim, and the promissory notes defendant

26   provided to justify it, are obviously bogus.  Much like the

27   promissory note that defendant and Ms. Stewart backdate to make

28   it appear as though the proceeds of the "Purple File" property

18

sales being given to defendant were "loans," defendant's 89 promissory notes were created to make it deceive the government into believing the money he was receiving from Danbury and NFC was not income.  Indeed, Danbury Consultants and NFC were set up so that defendant could have a corporate straw to hide his income from his victims and the government.  The promissory notes defendant produced to the grand jury appear to be another fraud that defendant has undertook to evade responsibility.

Defendant continued to try and evade paying taxes ever after the guilty plea.  Defendant, through counsel, negotiated a very favorable plea agreement with the government.  One of the terms of that plea was that defendant had to file tax returns and pay his taxes.  Defendant filed his tax returns but did not start paying the hundred of thousands of dollars in taxes due and owing until *after* the government informed him the plea agreement had been breached.  Defendant's attempt to evade paying these taxes echo all defendant's previous conduct engineered to avoid taking responsibility, with the attendant financial consequences, of his fraudulent activities.  To this very day, defendant's own home is held in someone else's name to guarantee the defendant does not have to take financial responsibility and repay the money he stole.

A guideline sentence is a just and reasonable sentence.

### III.

### CONCLUSION

Based on the foregoing, if the Court finds defendant materially breached the plea agreement, then the government recommend this Court impose a guideline sentence.  In the event

19

1   the Court does not so find the government respectfully request

2   that the Court sentence defendant at the high-end of the

3   sentencing range set forth in the plea agreement.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF ANDREW STOLPER

I, Andrew Stolper, declare as follows:

    1.  I am the Assistant United States Attorney assigned to United States v. Kenneth Ketner.

    2.  I have been in daily contact with the IRS Revenue Agent responsible for Kenneth Ketner ("defendant"). The information concerning defendant's outstanding taxes was provided to me by the Revenue Agent on April 23, 2007.

    3.  Attached, as described in the table BELOW, are true and correct copies of the following documents:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Defendant's plea agreement |
| B | Interview report for Tami Ruffoll |
| C | Interview reports for Roberta Martin |
| D | Interview reports for Beverly Fleming |
| E | Interview reports for Terry Stone and Roger Luby |
| F | Interview reports and plea agreement for co-defendant Allen Johnson |
| G | Interview reports for Paul Olivera |
| H | Defendant's bankruptcy petition and selected schedules printed from PACER |
| I | Interview reports for Pamela Stewart |
| J | Bankruptcy court non-dischargeable judgements against defendant printed from PACER. |
| K | Interview report for Rick Arvielo |
| L | Interview report for Kristen Ketner |
| M | Interview report for Christine Glenn |
| N | Secretary of State printouts for Danbury Consultants and NFC |

21

| O | Transaction reports for 22 Cape Danbury, Newport Beach, California printed from WESTLAW |
| P | Promissory Notes |
| Q | Correspondence concerning promissory notes |
| R | Defendant's recent payments to the IRS |
| S | Household phone survey with names and telephone numbers redacted |

I certify under penalty of perjury the foregoing is true and correct to the best of my knowledge.

4/23/07
_____
DATE

_____
ANDREW STOLPER