CHRON

COPY

FILED

2006 JUL 19 PM 3: 50
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY _____

1  DEBRA WONG YANG
   United States Attorney
2  WAYNE R. GROSS
   Assistant United States Attorney
3  Chief, Santa Ana Branch
   KENNETH B. JULIAN (Cal. State Bar # 149840)
4  Assistant United States Attorney
   Deputy Chief, Santa Ana Branch
5  BRENT G. TABACCHI (Cal. Bar No. Pending)
   Assistant United States Attorney
6       Ronald Reagan Federal Building and Courthouse
        411 West Fourth Street, Suite 8000
7       Santa Ana, California 92701
        Telephone: (714) 338-3540
8       Facsimile: (714) 338-3708
        Brent.Tabacchi@usdoj.gov
9
   Attorney for Plaintiff
10 United States of America

11                UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                    SOUTHERN DIVISION

14 UNITED STATES OF AMERICA,      ) Case No. SA CR 05-36-JVS
                                  )
15            Plaintiff,          ) PLEA AGREEMENT FOR DEFENDANT
                                  ) KENNETH KETNER
16            v.                  )
                                  )
17 KENNETH KETNER,                )
                                  )
18            Defendant.          )
                                  )
19                                )
   _____)

20

21      1.   This constitutes the plea agreement between defendant

22 KENNETH KETNER ("defendant") and the United States Attorney's

23 Office for the Central District of California ("the USAO") in the

24 above-captioned case.  This agreement is limited to the USAO and

25 cannot bind any other federal, state or local prosecuting,

26 administrative or regulatory authorities.

27 //

28 //

**EXHIBIT** A

<u>PLEA</u>

2.   Defendant agrees to plead guilty to counts nine and sixteen of the indictment in <u>United States v. Kenneth Ketner</u>, Case No. SA CR 05-36-JVS.

<u>NATURE OF THE OFFENSES</u>

3.   In order for defendant to be guilty of count nine, which charges a violation of Title 18, United States Code, Section 1343, the following must be true: (1) the defendant knowingly devised or knowingly participated in a scheme to defraud; (2) the statements made or facts omitted as part of the scheme were material; (3) the defendant acted with the intent to defraud; and (4) the defendant used, or caused someone to use, wire communications in commerce to carry out or to attempt to carry out the scheme or plan.

In order for defendant to be guilty of count sixteen, which charges a violation of Title 18, United States Code, Section 1957, the following must be true: (1) the defendant knowingly engaged or attempted to engage in a monetary transaction; (2) the defendant knew the transaction involved criminally derived property; (3) the property had a value of greater than $10,000; (4) that the property was, in fact, derived from wire fraud; and (5) the transaction occurred in the United States.

Defendant admits that defendant is, in fact, guilty of these offenses as described in counts nine and sixteen of the indictment.

<u>PENALTIES AND RESTITUTION</u>

4.   The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1343

2

1   that occurred prior to July 30, 2002 is: 5-years imprisonment; a
2   3-year period of supervised release; a fine of $250,000 or twice
3   the gross gain or gross loss resulting from the offense,
4   whichever is greatest; and a mandatory special assessment of
5   $100.

6        The statutory maximum sentence that the Court can impose
7   for a violation of Title 18, United States Code, Section 1957 is:
8   10-years imprisonment; a 3-year period of supervised release; a
9   fine of $250,000 or twice the gross gain or gross loss resulting
10  from the offense, whichever is greatest; and a mandatory special
11  assessment of $100.

12       Therefore, the total maximum sentence for all offenses to
13  which defendant is pleading guilty is: 15-years imprisonment; a
14  3-year period of supervised release; a fine of $500,000 or twice
15  the gross gain or gross loss resulting from the offense,
16  whichever is greatest; and a mandatory special assessment of
17  $200.

18       5.  Defendant understands that defendant will be required to
19  pay full restitution to the victims of the offenses.  Defendant
20  agrees that, in return for the USAO's compliance with its
21  obligations under this agreement, the amount of restitution is
22  not restricted to the amounts alleged in the counts to which
23  defendant is pleading guilty and may include losses arising from
24  charges not prosecuted pursuant to this agreement as well as all
25  relevant conduct in connection with those charges.  Defendant
26  further agrees that defendant will not seek the discharge of any
27  restitution obligation, in whole or in part, in any present or
28  future bankruptcy proceeding.

3

1    6.   Supervised release is a period of time following
2 imprisonment during which defendant will be subject to various
3 restrictions and requirements.  Defendant understands that if
4 defendant violates one or more of the conditions of any
5 supervised release imposed, defendant may be returned to prison
6 for all or part of the term of supervised release, which could
7 result in defendant serving a total term of imprisonment greater
8 than the statutory maximum stated above.

9    7.   Defendant also understands that, by pleading guilty,
10 defendant may be giving up valuable government benefits and
11 valuable civic rights, such as the right to vote, the right to
12 possess a firearm, the right to hold office, and the right to
13 serve on a jury.

14    8.   Defendant further understands that the conviction in
15 this case may subject defendant to various collateral
16 consequences, including but not limited to, deportation,
17 revocation of probation, parole, or supervised release in another
18 case, and suspension or revocation of a professional license.
19 Defendant understands that unanticipated collateral consequences
20 will not serve as grounds to withdraw defendant's guilty plea.

21                        FACTUAL BASIS

22    9.   Defendant and the USAO agree and stipulate to the
23 statement of facts provided below.  This statement of facts
24 includes facts sufficient to support a plea of guilty to the
25 charge described in this agreement and to establish the
26 sentencing guideline factors set forth in paragraph 12 below.  It
27 is not meant to be a complete recitation of all facts relevant to
28 the underlying criminal conduct or all facts known to defendant

4

1   that relate to that conduct.  The stipulated facts are as

2   follows:

3        At all times relevant to this plea agreement, Kenneth Ketner

4   was one of the operators of Mortgage Capital Resources ("MCR"), a

5   mortgage brokerage firm located in Orange County, California, and

6   elsewhere.  Drawing on lines of credit from commercial lenders--

7   most notably, Household Commercial Financial Services

8   ("Household")--MCR purported to fund home loans for borrowers

9   throughout the country.

10       As part of its business, MCR requested on hundreds of

11  occasions that Household wire money from the line of credit to

12  fund specific mortgages.  In these requests, MCR identified the

13  specific borrower to whom these funds would be disbursed.

14  Relying upon these representations, Household agreed to fund the

15  specified loans and wired money for that purpose to a closing

16  agent, attorney Allen Johnson.  Household expected that MCR and

17  Johnson would not use this money for any purpose other than to

18  fund the loans of the identified borrowers.

19       Rather than complying with their promises and

20  representations to Household, Ketner, with the knowing assistance

21  of other MCR officers and employees, diverted for improper and

22  fraudulent uses the money earmarked for the borrowers.  In this

23  way and to facilitate this scheme, Ketner improperly directed

24  Johnson to transfer Household's money from his attorney-client

25  trust account to an MCR-controlled account at La Salle Bank.

26  Acting on such directions, Johnson diverted millions of dollars

27  belonging to Household to MCR's accounts.  With the knowing

28  assistance of other MCR officers and employees, Ketner then used

5

1  this money to operate MCR and to pay his own personal expenses,

2  such as payments on his house, boat, and credit cards.

3      Having improperly diverted this money to his own benefit and

4  for his own purposes, Ketner and MCR could not fund many of the

5  mortgages for which Household had wired money.  To conceal this

6  fact, Ketner instructed his employees to fund their way out of

7  this problem.  More precisely, he caused MCR to find new loans

8  that Household would agree to fund; Ketner then caused the money

9  earmarked for these new loans to pay off the original borrowers

10 whose funds had been misappropriated.

11      To further this scheme, on or about May 22, 2000, Ketner

12 caused Household to wire approximately $346,500 from its accounts

13 in Illinois to Johnson's client trust account at Sanwa Bank in

14 California.  In causing this wire transfer, Ketner did not intend

15 to use the money as promised--namely, to fund the loan of

16 borrowers identified in the wire transfer requests.  Rather,

17 Ketner intended to divert these proceeds to fund the loans of

18 borrowers whose money MCR already had misappropriated.  As a

19 result of this scheme, including his misappropriation and

20 diversion of funds, Ketner caused Household and other lenders to

21 suffer approximately $9.2 million in losses.

22      Ketner also laundered a portion of the money that MCR

23 received as a result of this scheme.  Having fraudulently caused

24 Household to wire money to Johnson's client trust account, Ketner

25 then caused Johnson to transfer the proceeds from this fraud to

26 MCR's account at La Salle Bank.  From this location, Ketner

27 caused the proceeds from the fraud to be further disbursed to

28 other bank accounts in the United States.  For instance, on or

6

1 about May 22, 2000, Ketner caused to be wired from Johnson's bank

2 account at Sanwa Bank to one of MCR's accounts at La Salle Bank

3 $335,000 that Ketner knew was derived from his wire fraud scheme.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

5     10.   By pleading guilty, defendant gives up the following

6 rights:

7         a) The right to persist in a plea of not guilty.

8         b) The right to a speedy and public trial by jury.

9         c) The right to the assistance of legal counsel at

10 trial, including the right to have the Court appoint counsel for

11 defendant for the purpose of representation at trial. (In this

12 regard, defendant understands that, despite his or her plea of

13 guilty, he or she retains the right to be represented by counsel

14 - and, if necessary, to have the court appoint counsel if

15 defendant cannot afford counsel - at every other stage of the

16 proceedings.)

17         d) The right to be presumed innocent and to have the

18 burden of proof placed on the government to prove defendant

19 guilty beyond a reasonable doubt.

20         e) The right to confront and cross-examine witnesses

21 against defendant.

22         f) The right, if defendant wished, to testify on

23 defendant's own behalf and present evidence in opposition to the

24 charges, including the right to call witnesses and to subpoena

25 those witnesses to testify.

26         g) The right not to be compelled to testify, and, if

27 defendant chose not to testify or present evidence, to have that

28 choice not be used against defendant.

7

1     By pleading guilty, defendant also gives up any and all

2  rights to pursue any affirmative defenses, Fourth Amendment or

3  Fifth Amendment claims, and other pretrial motions that have been

4  filed or could be filed.

5                          SENTENCING FACTORS

6     11.  Defendant understands that the Court is required to

7  consider the United States Sentencing Guidelines ("U.S.S.G." or

8  "Sentencing Guidelines") among other factors in determining

9  defendant's sentence.  Defendant understands, however, that the

10 Sentencing Guidelines are only advisory, and that after

11 considering the Sentencing Guidelines, the Court may be free to

12 exercise its discretion to impose any reasonable sentence up to

13 the maximum set by statute for the crimes of conviction.

14     12.  Defendant and the USAO agree and stipulate to the

15 following applicable Sentencing Guideline factors[1]:

16 Wire Fraud

17     Base Offense Level   :     6    [U.S.S.G. § 2F1.1(a)]

18     Specific Offense
       Characteristics

19

20     Loss in Excess
       of $5,000,000
       (i.e., $9,200,000)   :    +14   [U.S.S.G. § 2F1.1(b)(1)(O)]

21

22     More Than
       Minimal Planning     :    +2    [U.S.S.G. § 2F1.1(b)(2)(A)]

23     Supervisor/
       Leader               :    +3    [U.S.S.G. § 3B1.1(b)]

24

25     Subtotal for
       Offense              :    25

26  _____

27     [1]  The parties stipulate and agree that the United States

28 Sentencing Guidelines effective November 1, 1998, i.e., the 1998
   Guidelines, govern this case.

· 8

029

1  <u>Money Laundering</u>

2      Base Offense Level  :      20    [U.S.S.G. § 2S1.1]

3      Specific Offense
       Characteristics
4
       Funds in Excess
5      of $200,000         :      +2    [U.S.S.G. § 2F1.1(b)(1)]
       Subtotal for
6      Offense             :      <u>22</u>

7  <u>Grouping Calculations and Acceptance</u>
8
       Pre-grouping
9      Subtotal            :      25

10     Grouping Adjustment :      +2    [U.S.S.G. § 3D1.4(a)]

11     Acceptance of
       Responsibility      :      -3    [U.S.S.G. § 3E1.1(a)]
12
       Total Adjusted
13     Offense Level       :      <u>24</u>

14  The USAO and defendant agree that no other specific offense

15  characteristics, departures, or adjustments apply.

16     13.   There is no agreement as to defendant's criminal

17  history or criminal history category.

18     14.   The stipulations in this agreement do not bind either

19  the United States Probation Office or the Court.  Both defendant

20  and the USAO are free to: (a) supplement the facts by supplying

21  relevant information to the United States Probation Office and

22  the Court; (b) correct any and all factual misstatements relating

23  to the calculation of the sentence; and (c) argue on appeal and

24  collateral review that the Court's sentencing calculations are

25  not error, although each party agrees to maintain its view that

26  the calculations in paragraph 12 are consistent with the facts of

27  this case.

28  //

                              9

                             030

## DEFENDANT'S OBLIGATIONS

15. Defendant agrees that he or she will:

a) Plead guilty as set forth in this agreement.

b) Not knowingly and willfully fail to abide by all sentencing stipulations contained in this agreement.

c) Not knowingly and willfully fail to: (I) appear as ordered for all court appearances, (ii) surrender as ordered for service of sentence, (iii) obey all conditions of any bond, and (iv) obey any other ongoing court order in this matter.

d) Not commit any crime; however, offenses which would be excluded for sentencing purposes under U.S.S.G. § 4A1.2[©] are not within the scope of this agreement.

e) Not knowingly and willfully fail to be truthful at all times with Pretrial Services, the U.S. Probation Office, and the Court.

f) Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay;

g) To fill out and deliver to the USAO a completed financial statement listing defendant's assets on a form provided by the United States Attorney's Office;

h) Within six months of entering a guilty plea pursuant to this agreement, to file with the Internal Revenue Service ("IRS") Federal income tax returns for tax years 2001 through 2005, to pay any amounts due and owing (including penalties), and to comply with all rules and regulations of the IRS.

//
//
//

10

031

## THE USAO'S OBLIGATIONS

16.   If defendant complies fully with all defendant's obligations under this agreement, the USAO agrees:

a) To abide by all sentencing stipulations contained in this agreement.

b) At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, to recommend a two-level reduction in the applicable sentencing guideline offense level, pursuant to U.S.S.G. § 3E1.1, and to recommend and, if necessary, move for an additional one-level reduction if available under that section.

c) At the time of sentencing to move to dismiss the remaining counts of the indictment as against defendant. Defendant agrees, however, that at the time of sentencing the Court may consider the dismissed counts in determining the applicable Sentencing Guidelines range, where the sentence should fall within that range, the propriety and extent of any departure from that range, and the determination of the sentence to be imposed after consideration of the sentencing guidelines and all other relevant factors.

## BREACH OF AGREEMENT

17.   If defendant, at any time between the execution of this agreement and defendant's sentencing on a non-custodial sentence or surrender for service on a custodial sentence, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  If the USAO declares this agreement breached, and the

11

032

1   Court finds such a breach to have occurred, defendant will not be
2   able to withdraw defendant's guilty plea, and the USAO will be
3   relieved of all of its obligations under this agreement.

4       18.   Following a knowing and willful breach of this
5   agreement by defendant, should the USAO elect to pursue any
6   charge that was either dismissed or not filed as a result of this
7   agreement, then:

8           a) Defendant agrees that any applicable statute of
9   limitations is tolled between the date of defendant's signing of
10  this agreement and the commencement of any such prosecution or
11  action.

12          b) Defendant gives up all defenses based on the statute
13  of limitations, any claim of preindictment delay, or any speedy
14  trial claim with respect to any such prosecution, except to the
15  extent that such defenses existed as of the date of defendant's
16  signing of this agreement.

17          c) Defendant agrees that: I) any statements made by
18  defendant, under oath, at the guilty plea hearing; ii) the
19  stipulated factual basis statement in this agreement; and iii)
20  any evidence derived from such statements, are admissible against
21  defendant in any future prosecution of defendant, and defendant
22  shall assert no claim under the United States Constitution, any
23  statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of
24  the Federal Rules of Criminal Procedure, or any other federal
25  rule, that the statements or any evidence derived from any
26  statements should be suppressed or are inadmissible.

27  //
28  //

12

## LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

19.   Defendant gives up the right to appeal the Court's determination of the applicable Sentencing Guidelines range, including the method by which the Court calculated that range, with the following exceptions:  the defendant can appeal (a) any upward departure in offense level or criminal history category; (b) any determination that the total offense level is above 24; and (c) the court's determination of defendant's criminal history category.  Defendant retains the ability to appeal his sentence on all other grounds, including in particular the reasonableness of the sentence imposed by the court, with the exception that defendant gives up the right to appeal the following conditions of probation and/or supervised release that may be imposed by the court: standard conditions set forth in district court General Orders 318 and 01-05; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

20.   Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or a retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.

21.   The USAO gives up its right to appeal the Court's Sentencing Guidelines calculations, provided that (a) the Court does not depart downward in offense level or criminal history category and (b) the Court determines that the total offense

13

1  level is 24 or above and imposes a sentence within the range

2  corresponding to the determined total offense level and criminal

3  history category.

4  <center>COURT NOT A PARTY</center>

5      22.   The Court is not a party to this agreement and need not

6  accept any of the USAO's sentencing recommendations or the

7  parties' stipulations.   Even if the Court ignores any sentencing

8  recommendation, finds facts or reaches conclusions different from

9  any stipulation, and/or imposes any sentence up to the maximum

10  established by statute, defendant cannot, for that reason,

11  withdraw defendant's guilty plea, and defendant will remain bound

12  to fulfill all defendant's obligations under this agreement.   No

13  one - not the prosecutor, defendant's attorney, or the Court -

14  can make a binding prediction or promise regarding the sentence

15  defendant will receive, except that it will be within the

16  statutory maximum.

17  <center>NO ADDITIONAL AGREEMENTS</center>

18      23.   Except as set forth herein, there are no promises,

19  understandings or agreements between the USAO and defendant or

20  defendant's counsel.   Nor may any additional agreement,

21  understanding or condition be entered into unless in a writing

22  signed by all parties or on the record in court.

23  //

24  //

25  //

26  //

27  //

28  //

<center>14</center>

<center>035</center>

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

24.   The parties agree and stipulate that this Agreement will be considered part of the record of defendant's guilty plea hearing as if the entire Agreement had been read into the record of the proceeding.

This agreement is effective upon signature by defendant and an Assistant United States Attorney.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF CALIFORNIA

DEBRA WONG YANG
United States Attorney

_____          2/17/06
BRENT G. TABACCHI                          Date
Assistant United States Attorney

I have read this agreement and carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the Sentencing Guideline provisions, and of the consequences of entering into this agreement. No promises or inducements have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

_____          7/15/06
KENNETH KETNER                             Date
Defendant

I am KENNETH KETNER's attorney. I have carefully discussed every part of this agreement with my client. Further, I have

15

1  fully advised my client of his/her rights, of possible defenses,

2  of the Sentencing Guidelines' provisions, and of the consequences

3  of entering into this agreement.  To my knowledge, my client's

4  decision to enter into this agreement is an informed and

5  voluntary one.

6

7  _____      7/17/06

   TERRY BIRD, ESQ.             Date

8  Benjamin Gluck

   Counsel for Defendant

9  KENNETH KETNER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE BY MAIL

I, **Linda Lewis**, declare:

That I am a citizen of the United States and resident or employed in Orange County, California; that my business address is Office of United States Attorney, 411 West Fourth Street, Eighth Floor, Santa Ana, California 92701-4599; that I am over the age of eighteen years, and am not a party to the above-entitled action; that I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on **July 19, 2006**, I deposited in the United States mail, Santa Ana, California in the above-entitled action, in an envelope bearing the requisite postage, a copy of: **PLEA AGREEMENT FOR DEFENDANT KENNETH KETNER**

addressed to:   Benjamin Gluck
               Bird Marella
               1875 Century Park East
               23rd Floor
               Los Angeles, CA 90067

at his/her last known address, at which place there is delivery service by United States mail.

This Certificate is executed on **July 19, 2006** at Santa Ana, California.

I certify under penalty of perjury that the foregoing is true and correct.

_Linda Lewis_
Linda Lewis

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   02/22/2005

    Tami Ruffoll, date of birth 12/22/1957, who resides at 1412 E. Dana Place, Orange, CA, 92866, home telephone number (714)744-8006, cellular telephone number (949)278-6442, contacted Assistant United States Attorney Andrew Stolper based on a news report she heard on the radio about Ken Ketner.  AUSA Stolper then forwarded the call to the interviewing agent.  Ruffoll was advised of the identity of the interviewing agent and the purpose of the interview.  She then voluntarily provided the following information:

    In 1981 or 1982, Ruffoll was working at GMAC Mortgage in Riverside, CA.  The branch manager of the office was Ken Ketner.  Ketner instructed Ruffoll to fraudulently fill out bogus rent receipts on behalf of borrowers to facilitate the approval of loans.  Ketner also told her to fraudulently change or modify VA forms (MCRV's) to facilitate the approval of VA loans.  MCRV (Master Certificate of Reasonable Value) was a form required by the Veterans Administration that depicts whether or not a sub-division is qualified for a VA loan, and if so, it reflects a value that the VA will consider for lending purposes on a specified property.  Ruffoll refused to comply with Ketner's demand to commit fraud.

    A short time later Ruffoll observed a friend/co-worker, Cheryl Last Name Unknown (LNU), conducting the same or similar fraud that Ketner had demanded of her.  Ruffoll asked Cheryl LNU why she was filling out the documents in a fraudulent manner.  Cheryl LNU told her that Ketner had instructed her to fill out the paper work with specific instructions as to the fraudulent representations.  Ruffoll told her friend not to commit fraud on Ketner's behalf.  Ketner learned of Ruffoll's instruction to the other employer and told Ruffoll not to instruct others regarding this matter.

    Ruffoll then telephonically contacted the main GMAC office, located in San Diego, and told them of Ketner's fraudulent behavior.  She then started her already planned three week vacation.

    Upon her return to work, Ruffoll observed Ketner being escorted out of the office.  She was not aware of the exact circumstances regarding his departure and the escort requirement,

---

Investigation on   2/18/2005   at Santa Ana, CA                (telephonically)

File # 29B-LA-224315                                Date dictated   2/22/2005

by   SA Paul L. Bonin/plb

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT  B

FD-302a (Rev. 10-6-95)

29B-LA-224315

Continuation of FD-302 of ___Tami Ruffoll_____, On _2/18/2005_, Page __2__

but assumed it had something to do with her passing on Ketner's fraud to the San Diego office.

Before leaving, Ketner threatened Ruffoll by telling her that he knew where she lived and that she would not live there long.

Ruffoll agreed to cooperate with the investigation, to include testifying, and attempting to identify and locate the other employee from GMAC who was instructed to conduct fraud by Ketner.

APR-13-2007  10:21                                          P.13

FD-302 (Rev. 10-6-95)

-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/03/2004

Roberta L. Martin, date of birth 4/15/1954, SSN 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, who resides at 29256 Lakeview Lane, Highland, CA, home telephone number (909)863-7585, work telephone number (909)680-3659, was interviewed pursuant to a proffer agreement at the Santa Ana United States Attorney's office. Also present was Martin's attorney, Richard Beswick, telephone number (909)888-5741, Assistant United States Attorney Andrew Stolper, and IRS-CID Special Agent Eric Helfand. Martin was advised of the identity of the interviewing agent and the purpose of the interview. She then voluntarily provided the following information:

Other than her previous 2001 interview with the FBI, Martin has not met with law enforcement or other investigative entities regarding her knowledge of Mortgage Capital Resources (MCR) or Kenneth Ketner. The law firm of Marshack and Schulman asked Martin to appear for a deposition, but it never took place. This was in connection with a civil law suit on behalf of Benefit Land Title.

Martin last spoke with Ketner about two years ago. He called Martin late one night. Martin recognized Ketner to be drunk. His stated purpose of the call was to apologize and to invite Martin to lunch. Martin declined the lunch invitation, and did all she could to avoid his further contact attempts.

Martin first met Ketner around 1982. Both worked at S&L Mortgage, Ketner as a loan officer and Martin as a loan processor. Later, both worked for Colonial Mortgage performing similar duties. Ketner then began working at California Financial Corporation (CFC). In about 1990, Martin also came to work at CFC, first as a loan processor and later as Ketner's assistant. Ketner was the CEO or owner of CFC.

In the mid 1990's Ketner decided to declare Bankruptcy on behalf of CFC, and start a new company called Mortgage Capital Resources. Ketner stepped down as president of CFC and asked Martin to be the new figurehead president. Martin agreed. Soon thereafter the department of Housing and Urban Development (HUD) conducted an audit at CFC and discovered a number of HUD insured loans were fraudulent. HUD decided to hold CFC accountable for the bad loans. Although Martin was the current President in name only

Investigation on   4/30/2004   at  Santa Ana, CA

File #  29B-LA-224315                    Date dictated   5/03/2004

by   SA Paul L. Bonin/plb

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT 

FD-302a (Rev. 10-6-95)

29B-LA-224315

| | | | |
|---|---|---|---|
| Continuation of FD-302 of | Roberta L. Martin | .On 4/30/2004 | ,Page 2 |

she was partially liable according to Ketner and HUD.  Ketner
settled with HUD and agreed to pay $200,000 - 300,000.  Ketner told
Martin that since he was the actual President he would not ask her
to make any of the quarterly payments to HUD.  Ketner made all
payments on her behalf.

At around this same time Ketner started MCR.  He named
himself as President, and Martin started as Ketner's administrative
assistant.  She later became the funding manager.  Martin agreed
to work at MCR because she wanted to make sure Ketner made the
required payments to HUD for which she was liable.  MCR was totally
controlled by Ketner, who was a micro-manager.  No decisions were
made without the approval of Ketner.  Randy Bristol worked there
and had a small interest in the company.

If a proposed property loan came to MCR, attempts to
originate the loan started.  First the loan proposal went to the
underwriting department.  If the buyer (borrower) was approved, the
property was inspected, loan documents were drawn, and the borrower
would sign escrow documents.  The loan was then submitted to MCR's
funding department.  MCR would then contact the bank with whom a
line of credit was already in place.  The bank would wire the
necessary funds to the escrow company.  The funds were not supposed
to come to MCR.  The purpose of the escrow company was to hold the
funds until closing and to make sure the funds were used for their
intended purpose.  The escrow/settlement agency released the funds.

MCR also funded second mortgages.  The process of funding
these loans was different, but Martin was not sure of these
details.  Checks issued to individuals who applied for and received
second mortgages often bounced.

Robert Johnson was an attorney who shared office space
with MCR.  Johnson performed duties relating to MCR, but he always
dealt directly with Ketner.  MCR had an office in Georgia.  The
closing agent (escrow) duties in Georgia could legally be handled
by an attorney, and Johnson performed this duty for MCR.  Matt
Hadari handled the books for Johnson.  Johnson and Ketner were
friends before doing business together.  Martin was given signature
authority on Johnson's business account.  It was explained to her
that a second signature was required for the account and Martin
agreed to perform this function.  When Johnson presented a check
for her signature she complied.  Funds often went from the Johnson
account (to be used for loans) directly to various MCR accounts, to

APR-13-2007  10:21                                                    P.15

FD-302a (Rev. 10-6-95)

29B-LA-224315

Continuation of FD-302 of    Roberta L. Martin             , On 4/30/2004 , Page    3

include the general operating account.  This seemed inappropriate
to Martin.  Martin often heard Ketner tell Johnson to wire money
from the Johnson account to MCR accounts.  All money transactions
were done at the direction of Ketner.  Martin also heard Ketner
tell Hadari to wire funds from the Johnson account.

Ketner was paid about $16,000 per month in salary, and
received considerable additional compensation by using company
funds for expenses.  Martin is not sure exactly how much this
additional compensation amounted to.  When Ketner wanted money he
would call accounting and have them issue a check.  Ketner lived on
Lido Island.  The monthly house payments were sent in by Martin on
checks from Ketner's personal account.  The house was sold in 1999
or 2000.  Ketner purchased a Ferrari automobile in 1999.  The car
was financed, but a considerable down payment was made.  Martin is
not sure of the source of the down payment.

In 1996, Ketner asked Martin to assist in covering up bad
loans.  Certain properties were financed with fraudulent loan
documentation.  The loans were financed by lines of credit to CFC
and MCR.  To conceal the problem, Ketner had Martin and others act
as straw buyers.  The properties were bought and sold numerous
times by the straw buyers to keep the issuers of the lines of
credit from discovering the fraud.  Ketner promised Martin the
situation was temporary and would stop as soon as he could sell the
properties legitimately.  Martin understood that she was not
actually purchasing the property.  Documentation supporting the
straw sales were prepared and submitted with all participating
parties' understanding of the fraudulent nature of the transaction.
Ketner used his strong, persuasive personality to convince Martin
and others to act as straw buyers.  Many others (names not
provided) were asked and participated as straw buyers.  Martin
prepared loan documentation for the straw sales that revealed who
the other participants were.  Two individuals who refused to
participate as straw buyers were Pam Stewart and Beverly Fleming.
Eventually, Martin also refused to be named as a straw buyer.

Loan files relating to the "straw sales" were maintained
in purple files so as not to mix them with legitimate loan files.
This also insured that the loans would not be submitted for sale to
companies that could possible discover the scheme.  Eventually the
constant flipping of the properties created title problems alerting
the issuers of the lines of credit to potential problems.
Eventually Household Financial, the issuers of a line of credit to
MCR conducted an audit and discovered Ketner's fraudulent property

APR-13-2007  10:22                                                    P.16

FD-302a (Rev. 10-6-95)


29B-LA-224315


Continuation of FD-302 of ____ Roberta L. Martin ____ , On _4/30/2004_ , Page __4__

flipping.  Others who knew about the fraud related to the purple
file loans were Val Benincosa and Beverly Fleming.  Martin heard
both discussing the purple files with Ketner.

      Martin was shown a letter dated 3/17/1999, from MCR to
Johnson and Payne.  The letter was supposedly signed by Ketner.
Martin had vague recollection of the letter, or a similar letter
that Johnson asked Martin to sign with Ketner's signature.  Martin
often signed Ketner's signature if asked by Ketner.  On this
occasion Johnson presented the letter and asked Martin to sign for
Ketner.  The letter was back dated.  Martin signed and likely left
a copy for Ketner.  Martin agreed to sign the letter because
Johnson and Ketner had a close relationship and it did not seem
like a strange request.

      On at least one occasion Ketner went to the Caymans
Islands with Pam Stewart.  Both Ketner and Stewart told Martin of
the trip.  Rumors of a sexual relationship between Ketner and
Stewart circulated, but both were married to other people, and
Martin has no independent knowledge or confirmation of these
rumors.  Ketner told Martin he opened a bank account there with the
help of an attorney whose office was in the same building as MCR.
Martin is aware that MCR funds were sent to this bank account, but
is not familiar with the details of the transfer.

      At times payroll checks to MCR employees were not being
honored at the bank due to insufficient funds in the MCR operating
account.  Money was then made available from the Johnson/Payne
account to cover these checks.

      HOMEZIPPER.com (HZ) was a company started by Ketner.  It
was to be an online mortgage company.  Ketner solicited investors
for HZ, to include employees at MCR.  In July, 2000, Martin
invested $7500 in HZ, and was issued 137,000 HZ shares.  Ketner's
plan was to take HZ public in the near future, and promised
investors great returns.

      Another company associated with Ketner was KCK, which
Martin understood to be some kind of consulting firm.
      In addition to her salary, Martin received $1200/month in
the form of a loan.  The agreement with Ketner called for her to
pay this money back upon the sale of her Highland, CA, house.  To
date she has not sold the house.  Martin also drove a Mercedes
automobile while employed at MCR paid for by the company.

APR-13-2007  10:22                                                    P.17

FD-302a (Rev. 10-6-95)


29B-LA-224315


Continuation of FD-302 of    Roberta L. Martin                ,On 4/30/2004 ,Page  5

        After the debt to HUD was paid, in late 2000, Martin quit
MCR.

APR-13-2007  10:18                                                        P.02

05/04/2001

ROBERTA L. MARTIN, DOB 04/15/1954, SSN 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, 29138 Amberwood Lane, Highland, California, telephone number (909) 863-7585, was interviewed at the Santa Ana office of the FBI. MARTIN'S Attorney, RICHARD BESWICK, 323 West Court Street, #402, San Bernadino, California, telephone number (909) 888-5741, was present during the interview. The interview was conducted under a Proffer Agreement with the United States Attorneys Office.

In May 1990, MARTIN began working at CALIFORNIA FINANCIAL CORPORATION (CFC) as a loan processor. She became an administrative assistant to KENNETH KETNER, and then ran the funding department for a couple years. In 1995 MORTGAGE CAPITAL RESOURCES (MCR) purchased CFC and MARTIN became a Vice-President. She worked at the Hutton Center office from 1996 until she left the company in about October 2000. Her salary was $78,500 at the time.

SA Connell asked MARTIN about the so-called "purple files", which were loans taken out on real estate owned (REO) properties by MCR employees and KETNER'S friends and family members. MARTIN explained that MCR had to repurchase from investors several loans that went bad. She does not know why MCR did not foreclose on these REO properties and sell them to pay off the loans. Instead, KETNER put new loans on the properties to repay the existing loans. MARTIN was involved in putting the new loan packages together, but KETNER told her who the borrowers would be on each loan. MARTIN obtained closing statements for the borrowers and put the information from the original loan applications into the computer in order to generate the notes, deeds and printed copy of the loan application. DEBBIE BERMAN and at least one other assistant of MARTIN'S did some of this inputting work as well.

SA Connell showed MARTIN a list of six property transactions, which is attached to this document. MARTIN acknowledged that she permitted her name to be used to purchase these properties. MARTIN signed the notes and deeds on these transactions with an in-house notary, but did not complete or sign any loan applications to purchase them. She did not receive any compensation for doing this and did not seek to use the

05/04/2001        Santa Ana, CA

29B-LA-224315

SA John Connell

046

HAR-15-2007  10:19                                                   P.03

29B-LA-224315

          Roberta Martin                    05/04/2001        2

properties as tax write-offs.  She participated in these
transactions only because KETNER asked her to.

          At the time MARTIN'S loans occurred, the lending banks
were not requiring that MCR supply them with the borrower's loan
applications.  When the banks began to require MCR supply the
loan applications, loan applications for each borrower were put
together.  There was one master application for each borrower.
This master application was used to obtain several loans for each
borrower.  Escrow and title were opened on these transactions,
but these loans did not go through the normal procedures at MCR.
No underwriting was done on these loans, there was no appraisals
performed, they were kept segregated from the other loans in a
separate drawer, and no credit reports were ordered for the
borrowers.  Credit reports were ordered however, when the lending
banks began requesting them for the loans they were going to
fund.  Only one credit report was ordered for each borrower even
though those borrowers applied for several loans.  The first
credit report ordered was used for all subsequent loans.

          These loans were placed on MCR'S warehouse lines and
funded by banks, such as Republic Bank.  KETNER made many of
these loans FHA loans.  MCR, not the borrowers, were making the
interest payments on these loans.  MARTIN does not know where the
money came from to make these payments, as it was an accounting
function.

          MARTIN helped KETNER set up a bank account at Citizens
Business Bank (CBB).  MARTIN, KETNER and MARTIN'S ex-brother in-
law, RONALD MARTIN, were co-signers on the account.  The account
was used to deposit rent checks collected on the REO properties,
which had renters living in them.  Checks were written from the
account to pay for utilities, repairs and other expenses related
to the properties.  Early in 2000 when MCR was having problems
with the funding checks they disbursed to their borrowers not
clearing, a significant amount of money was deposited to the CBB
account.  RONALD MARTIN went to the bank to get cashiers checks
that were used to replace the borrowers' checks that did not
clear.

          MCR also had an account at Southern California Bank.
Money was wired through this account and used to pay off the
existing loans on the REO properties.  There was also a minimal

29B-LA-224315

Roberta Martin                    05/04/2001        3

amount of wiring from this account to replace funding checks that
did not clear around the second quarter 2000. MCR also
maintained accounts at LaSalle Bank and Bank of America (BOA).
MARTIN handled a lot of KETNER'S finances with his personal
banker at BOA.

MARTIN explained that funds from warehouse lines were
used to pay off older loans instead of funding the loans those
funds were designated for. MARTIN does not know what caused this
situation. KETNER gave MARTIN verbal instructions to move money
between accounts, which she passed on to ELIZABETH CONWAY,
DELORES MENDOZA or VAL BENINCOSA. KETNER also gave these
instructions directly to CONWAY, MENDOZA or BENINCOSA on some
occasions. There were no discussions or meetings concerning
these funding procedures, as KETNER made all the decisions
himself. KETNER was in charge at MCR the entire time MARTIN was
employed there.

MARTIN was aware that MCR sold investors loans which
had not been funded. MARTIN does not know if this was
intentional or not. MCR'S Atlanta office was responsible for
selling loans. MARTIN also acknowledged that MCR was making
payments to those investors on behalf of the borrowers who had
not been funded yet. MARTIN occasionally talked to borrowers
whose funding checks had not cleared. KETNER had given MARTIN
instructions on what to say to these borrowers, which included
excuses for why their funds did not clear.

MARTIN stated that the only reason she stayed with MCR
till October 2000, was because she was named in a Department of
Housing and Urban Development (HUD) settlement agreement, that
was not paid off until mid 2000. She left MCR after the
settlement was paid. MARTIN explained that before MCR purchased
CFC, MARTIN became President of CFC. Due to real estate rules
that forbid an individual from owning multiple real estate
businesses, KETNER, who was then the President of CFC, turned
over his title to MARTIN so he could be President of MCR. HUD
had to pay out money on several CFC originated loans, and
therefore took action against KETNER and MARTIN, who was now
President of the company. KETNER and MARTIN signed a settlement
agreement with HUD to repay $245,000. BESWICK provided the FBI
with copies of this settlement agreement and copies of several
payment checks and cover letters, which are attached to this

APR-13-2007  10:19                                                      P.05

29B-LA-224315

Roberta Martin                    05/04/2001        4

document.  The money used to pay HUD on this settlement agreement
came from MCR'S corporate penalty account.

     MCR maintained a corporate apartment in Atlanta.
MARTIN is aware of another corporate apartment at the Colony in
Newport Beach.  KETNER hosted annual trips to Cabo San Lucas for
MCR'S loan officers and branch managers as a thank you for their
work.

     KETNER had owned 30% of CITY MORTGAGE, located in
Phoenix, Arizona.  Due to real estate rules about owning multiple
businesses, KETNER put his ownership in MARTIN'S name.  MARTIN
did not get any paperwork regarding her ownership of the
business, but does remember signing something.  CITY MORTGAGE
originated loans, which were submitted to MCR.

     MARTIN identified the following individuals:

     GARY TIMMONS - former employee of PNC Bank, formerly
          Sears, with which MCR had a warehouse line-of-
          credit;  TIMMONS then went to LaSalle Bank, with
          which MCR opened a warehouse line-of-credit

     ALBERT ADAMS - KETNER'S step-father in-law in LaQuinta
          (married to SHIRLEY GREELEY)

     ANNE M. ALEXANDER - MCR loan officer in Palm Desert

     RICHARD G. BENTER - KETNER'S friend/associate in the
          insurance business

     VICTOR H. BOYD II - KETNER'S friend

     MONIQUE BRAUD - MCR loan officer in Culver City

     DIANE L. CALZADA - KETNER'S friend

     DIANNE D. DAVID - business associate of KETNER'S and
          MCR employee for a short time;  DAVID worked with
          MIKE BARRON, another business associate of
          KETNER'S

     SHIRLEY A. GREELEY - KETNER'S mother in-law in LaQuinta

HPR-13-2007  10:19                                                    P.06

29B-LA-224315

Roberta Martin                              05/04/2001        5

    (married to ALBERT ADAMS)

CHARLES HERMANSEN - business associate of KETNER'S

JOHN J. MAGNER - MCR loan officer in Santa Ana

CHARLES E. NEIGHBARGER - MCR loan officer in Riverside
    and MCR'S broker of record

PAUL OLIVERA - KETNER'S friend

SHELLY M. PAYNE - MCR'S funding manager in Riverside

DONALD W. PETTY - MCR'S Vice President of Production in
    Santa Ana

PAM STEWART - MCR loan officer in Santa Ana

LANNY E. ROSS - MCR'S branch manager in Culver City,
    which was formerly located in Los Angeles

JOHN B. SHERMAN - MCR employee in production department

CHARLES VUYTOWECZ - MCR branch manager in Rancho
    Bernardo

MICHAEL VUYTOWECZ - MCR loan officer in Rancho Bernardo

JOHN S. WHEATLEY - KETNER'S friend and business
    associate in commercial leasing in Upland/Ontario
    area;  WHEATLY found office space for MCR

BERNADINE TRUST - VICTOR BOYD'S mother's trust

FIRST CALIFORNIA PARTNERS - run by a friend of KETNER'S

NORTON PARTNERS - run by the same friend of KETNER'S
    who runs FIRST CALIFORNIA PARTNERS

S.C.I.T.S. EDUCATIONAL FOUNDATION - JAMES TRAUDT signed
    the paperwork for this entity;  ALLEN JOHNSON was
    involved as well

**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**



---

**In Re:**     KENNETH CHRISTOPHER KETNER     **Location:**     Beverly Fleming's Residence
18850 Cable Lane
Perris, CA 92570

**Investigation #:**     950430082
**Date:**                      June 17, 2004
**Time:**                      Approximately 4:05pm - 5:40pm
**Participant(s):**     Beverly Fleming, Witness
Emanuel Gonzalez, Special Agent
Eric J. Helfand, Special Agent

On the above stated date and time, Special Agents Emanuel Gonzalez and Eric Helfand identified themselves to Beverly Fleming and displayed their credentials for her review. Although at the time the interview was scheduled Fleming was informed of the topics to be discussed, she was again informed that the interview would center around KEN KETNER and the operations of Mortgage Capital Resources (MCR). Fleming was also advised of the importance that her statements be truthful. Fleming stated she understood, and voluntarily provided information during the course of the interview.

The following is a summary of information provided by Fleming during the course of the interview:

Personal Information:

1. Beverly Fleming has lived at 18850 Cable Lane for approximately 20 years. Her home phone number is 909-780-2775, and her cell phone number is 909-225-9785.

2. Fleming currently is employed by Home Loan Mortgage. Previous to this she was employed by IndyMac, Nationwide Residential Capital, MCR, and California Financial Corporation (CFC).

U.S. Treasury Criminal Investigation



Association with KETNER at CFC:

3.  KETNER contacted Fleming in 1993, and offered her a position at his company
    CFC, a mortgage lending company. At the time Fleming was employed in the
    mortgage industry, and stated KETNER did not have a good reputation.
    Fleming stated that she contemplated KETNER'S job offer for approximately 6
    months before accepting the position.

4.  Fleming stated that eventually CFC succumbed to financial difficulties, and filed
    bankruptcy. Previous to filing bankruptcy, CFC possessed a number of REO's.
    These REO's were properties that CFC had financed for borrowers, the
    borrower had subsequently defaulted on the loan, causing CFC to repossess
    the property. Fleming stated these REO's were not included in CFC's
    bankruptcy, and were considered the personal property of KETNER. While an
    employee of CFC, KETNER asked Fleming to put title to one of the REO's in
    her name. KETNER told Fleming that at his level of income, he could not take
    a tax deduction for the property, and stated she could use the property for tax
    purposes. KETNER informed Fleming that the property would be managed by
    a property management company, and she would not have to do anything.
    Fleming refused KETNER'S offer. She did not feel comfortable participating in
    such a transaction. Although KETNER did not use the term, Fleming felt as if
    he was asking her to become a "straw buyer" for an REO property. KETNER
    did not ask Fleming to participate in any such transactions again, but did ask
    others to participate in similar transactions. Fleming stated that these REO's
    were somehow transferred to MCR, the company that KETNER founded
    immediately following the demise of CFC.

MCR and "Purple Files":

5.  In approximately 1995, after the failure of CFC, Fleming became the Manager
    of MCR's loan processing office in Riverside, CA. Fleming stated that this was
    referred to as the "Corporate" office, while the office that KETNER worked out
    of in Santa Ana was referred to as the "Executive" office. Fleming stated that
    from the day she began working at MCR, until the day she left in August 2000,
    KETNER was the individual in charge of MCR. She noted that KETNER was a
    very hands-on leader, and directed the company's daily operations. KETNER,
    Roberta Martin (KETNER'S assistant), Al Johnson (attorney), a legal assistant,
    Pam Stewart, Mike Barron, and Dianne David (Barron's girlfriend) worked in the
    Santa Ana office. Fleming did on occasion travel to the Santa Ana office for
    business.

6. Fleming stated the following functions were performed at the Riverside office:
   - Underwriting
   - Funding
   - Quality Control
   - Appraisals
   - Servicing
   - Shipping
   - Accounting

   Fleming had management responsibility over all of the above functions, with the exception of accounting. Fleming also had oversight responsibility for multiple lines-of-credit which MCR had with various warehouse lending institutions. The lines-of-credit were used to fund loans originated by MCR. Fleming noted the loans that came through the Riverside office for processing were exclusively 1st mortgage loans. Fleming stated that although she was not sure of his exact title, Val Benicosa acted as the CFO for MCR's operations, and managed the accounting department out of the Riverside office.

7. Following is Fleming's summary of the standard flow of loan documents and funds once branch offices forwarded loan packages to MCR's corporate office in Riverside:

   - Complete 1st mortgage loan packages arrived in Riverside, and were forwarded to the appraisal, underwriting, and quality control departments to perform their respective tasks.

   - If authorized by the underwriting department, loan packages were forwarded to the shipping department, where the loan information was packaged and sent to a title company. The title company would perform a title search on the particular property as part of the loan process.

   - After confirming clear title on the property, the title company contacted MCR's funding department. MCR's funding department would then request funds be drawn from one of its warehouse lines-of-credit, and for the funds to be transferred to the title company, who acted as an independent third-party for distribution of the loan funds to the appropriate parties.

8. Fleming stated that process identified above was used for the vast majority of loan packages that came through the Riverside office. However, shortly after she began working at MCR in 1995, she began receiving "Purple File" loan documents from KETNER'S assistant, Roberta Martin. Fleming stated these particular loans were referred to as "Purple Files" because they arrived from Santa Ana in purple file folders, so they could be differentiated from normal loan packages. Fleming said when she saw one of the "Purple Files", she knew it was "Ken's loan". Fleming stated that the "Purple File" loans were for the REO's that KETNER had somehow transferred from CFC to MCR. The "Purple Files" were not complete loan packages, and contained a limited number of

documents signed (notarized) by the individuals purporting to apply for the loans. "Purple Files" were not processed in the same manner as regular loans, and the   following is Fleming's summary of the "Purple File" processing sequence:

- Roberta Martin provided Riverside office, via mail or in-person, "Purple Files".

- "Purple Files" bypassed MCR's underwriting and shipping departments, and were sent to the title company.

- Martin identified to MCR's funding department which MCR line-of-credit the loan funds were to be drawn from.  The "Purple File" was then returned to Martin in Santa Ana.  Fleming assumed that Martin received her direction from KETNER because of his before mentioned hands-on leadership role.

- Although Fleming did not have direct involvement with this side of the transaction, she believes that Martin advised the title company to pay-off a particular MCR line-of-credit with the loan proceeds derived from the "Purple File".  Again, Fleming assumed that Martin received her direction from KETNER.

9. Although the "Purple Files" were not delivered directly to her, Fleming indicated that the frequency with which the Riverside office received "Purple Files" increased from 1995 to 2000. Employees at the Riverside office would inform her by saying, "We have another Purple File".  As the frequency increased, Fleming recognized that the files were for the same properties, but with different loan applicant names.  Fleming also noticed that the same loan applicant names (all MCR employees and KETNER acquaintances) were being cycled between different "Purple File" properties.  Beginning in approximately 1999, Fleming noticed that particular "Purple File" properties were appearing on 2 MCR lines-of-credit simultaneously, indicating that MCR had requested funds for 2 loans on the same property, at the same time.  As a result of her oversight responsibility for the warehouse lines-of-credit, and her awareness of "Purple File" irregularities, Fleming questioned KETNER regarding "Purple Files" being on 2 lines-of-credit simultaneously.  KETNER told Fleming she was wrong, and that he had proof that properties were paid off on one line-of-credit before being used to request funds from another line-of-credit.  Fleming stated that after questioning KETNER regarding a particular line-of-credit, her oversight responsibility for that line-of-credit was subsequently taken away.  Fleming questioned KETNER on different occasions regarding different lines-of-credit, and each time her oversight responsibility for the line-of-credit was subsequently taken away.  Fleming stated that Shelly Payne and Tina Pline, both of whom worked in MCR's funding department, were also aware of irregularities with the "Purple Files".  After Fleming questioned KETNER about the funding irregularities, Payne and Pline were directed not to give "Purple File" funding sheets to Fleming.

10. Fleming did not have conversations with any of the individuals who appeared as borrowers on the "Purple Files", and could not recall any specific names. Fleming did have a conversation with Martin regarding the situation, and when Fleming asked Martin what was going on, Martin appeared to be upset and replied, "You really do not want to know". Fleming believed Martin was "in a bad situation" (at MCR). Fleming stated other names may have appeared on the titles of "Purple File" properties, but they were really KETNER'S properties.

11. When asked why KETNER was doing this (with the "Purple Files"), Fleming responded, "it was obvious....he was floating money". Fleming believed KETNER was using the funds to pay bills, and pay for other various items.

<u>MCR-Atlanta and bounced checks:</u>

12. Fleming stated that MCR had a large loan operations center in Atlanta, GA, that handled a significant number of 2nd mortgage and debt-consolidation type loans. Fleming identified Kevin Bonds and Randy Bristol as individuals who held management positions at MCR-Atlanta. After she mentioned Bonds' name, Fleming recalled hearing that KETNER asked Bonds to become a title holder on one of the "Purple File" properties, but when Bonds learned that he would not actually own the property, he became upset and refused KETNER'S offer. Fleming stated that MCR-Atlanta's closing agent, Al Johnson, worked in MCR's executive suites in Santa Ana. Fleming described a closing agent's role as being that of an independent third-party who facilitates the distribution of loan funds, analogous to an escrow/title agent. Fleming recalled that Johnson's business operated under the names Johnson & Dooley and Johnson & Payne.

13. Fleming described the flow of loan funds relating to MCR-Atlanta's 2nd mortgage/loan consolidation loans as follows:

- MCR requested loan funds from one of its warehouse lines-of-credit.
- The funds were transferred to closing agent Johnson & Dooley / Johnson & Payne.
- Fleming stated that the funds must have then been transferred from the closing agent to an MCR controlled bank account, since it was MCR who cut checks to the borrowers.

14. When asked why loan funds intended for borrowers were transferred from the closing agent to MCR, Fleming stated she did not know why this occurred, and that it actually negated the role of the closing agent as an independent third-party who distributed loan funds. Fleming stated that she heard rumors that KETNER had an ownership interest in Johnson & Payne (closing agent), and was under the impression that KETNER and Johnson were "pushing money" to each other.

15. Fleming became aware of problems involving MCR's Atlanta office towards the later part of her term of employment at MCR (could not recall specific time

period).  Fleming stated that prior to the problems, MCR-Atlanta cut checks for borrowers, and sent them directly to the borrower (or designee), but that at some point KETNER directed that the checks be sent to him in Santa Ana. KETNER determined what happened with them after that.  This is when Fleming began receiving telephone calls from MCR borrowers stating that the checks they had received from MCR had bounced.  Fleming stated the callers were very upset, and she did not know what to tell them, so she contacted KETNER.  KETNER simply told her he was working on the problem, and he would handle it.  Fleming stated that shortly after her conversation with KETNER, legal assistant Terry Stone was hired to handle calls from borrowers whose loan checks had bounced.

16. In a conversation with Fleming, Randy Bristol stated KETNER directed him to fund a certain dollar amount of loans, and that it was Bristol's responsibility to meet KETNER'S demand, whether the loans were ready to be funded or not.

17. Fleming overheard telephone conversations between accounting employee Eliza Au, Val Benincosa, and KETNER, where Au and Benincosa informed KETNER that payroll needed to be funded, and they did not know where the funds were going to come from.  It is Fleming's presumption that the funds that were supposed to be going to borrowers were being used to fund MCR's payroll, along with other expenses.  Fleming assumed that KETNER was directing this action, since he directed the flow of money at MCR.

18. According to Fleming there became a point in time when Au and Benincosa would not transfer funds in MCR's accounts without a written request from KETNER.

Post-MCR associations with KETNER:

19. Fleming left MCR in approximately August 2000.  She worked as a consultant for Nationwide Residential Capital (NRC), a company that planned on acquiring some of MCR's assets, for approximately 30 days after leaving MCR.  Fleming stated that the deal between MCR and NRC was never completed.

20. Matt Heidari, an accountant who had previously worked for KETNER, contacted Fleming approximately 1 year after she left MCR, and informed her that MCR had filed for bankruptcy, and that KETNER had listed her as an MCR officer on the bankruptcy petition.  Fleming was surprised by this because she was not an officer of MCR.  Around the same period of time Fleming was contacted by the IRS regarding MCR's unpaid employment taxes.  Fleming informed them she was no longer an employee, and had no knowledge about the situation.  The IRS also contacted Fleming regarding HomeZipper.  Fleming stated that she was never an employee of HomeZipper, and was never on the company's payroll.  She stated she may have signed a document as an officer.  Fleming theorized that KETNER used her name on corporate documents and bankruptcy filings because she has a good reputation, and also to conceal his involvement.  Fleming believes that KETNER does not currently have assets in

his name because of possible civil judgments against him, and heard in the past that KETNER had hired a criminal attorney because he thought he was going to jail.

21. Fleming's last contact with KETNER was approximately 6 months ago. KETNER attempted to contact her regarding business that New American Financial (NAF) was conducting with Home Loan Mortgage (her current employer). Fleming stated KETNER was not listed as an officer or owner of NAF, and must have been acting as a consultant for the mortgage broker located in Newport Beach, CA. Grant King was listed as the broker of record for NAF. Fleming ended up talking with Pam Stewart, a former MCR loan processing employee, who was also working for NAF. Stewart was also involved with the development of HomeZipper. Fleming usually spoke to Stewart when dealing with NAF. Fleming stated that Home Loan Mortgage funded a limited number of loans that were originated by NAF. Fleming did not believe that NAF had access to warehouse lines-of-credit. Fleming became aware that NAF lost its FHA approval, and made sure that Home Loan Mortgage terminated its business relationship with NAF.

22. Fleming stated that KETNER and Stewart have created another mortgage brokerage named Segway Financial. Stewart is the owner of record for Segway Financial. Fleming does not know any further details about the company, and stated that Home Loan Mortgage does not do business with Segway Financial.

23. Fleming stated that while she was employed at MCR, KETNER and Stewart were "traveling companions", and believed in they had an intimate involved, despite their efforts to conceal the relationship. Fleming mentioned that KETNER and Stewart shared apartments in Atlanta and Newport Beach.

24. Fleming stated that Stewart was on MCR's payroll, and when asked if this was her only source of income, Fleming responded that she did not know. Fleming did mention that she thought KETNER purchased Stewart a 2 karat diamond ring. She also mentioned that Stewart recently purchased a $1 million dollar home in Laguna Niguel. Fleming thought this was unusual for a loan processor to be able to afford a million dollar home. Fleming stated that KETNER may have been somehow involved with the down payment or purchase of Stewart's Laguna Niguel home.

U.S. Treasury Criminal Investigation

Miscellaneous Info.:

25. Fleming was deposed in October 2003 by MCR's bankruptcy trustee. She stated that during the deposition she was asked to identify numerous loan reconveyance documents, relating to "Purple File" properties, that she signed while employed at MCR. Fleming acknowledged that she signed the documents, explained that she would have signed these documents during the normal course of operations, and at the time probably didn't even look to see the addresses of the properties, or the names listed as the owners. When reviewing the documents at the deposition, Fleming did become aware that the names of individuals listed as owners were all friends or associates of KETNER.

26. Fleming was also contacted by an attorney for Household Bank. She could not remember the attorney's name, and was never interviewed or deposed.

27. Fleming thought she had a copy of an e-mail that was sent to her by KETNER, in which he stated he was sorry for putting her in such a bad situation (regarding MCR and related matters). Fleming was going to look for the e-mail and send a copy to S/A Helfand.

28. Fleming heard that KETNER filed for personal bankruptcy, but does not know any details about the situation.

I completed this memorandum on 06/25/2004, after refreshing my memory from notes made during and immediately after the interview with Beverly Fleming.

Eric J. Helfand
Special Agent

This memorandum contains a summary of pertinent information obtained from Beverly Fleming.

Emanuel Gonzalez
Special Agent

APR-13-2007  10:23                                                           P.23

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/22/2005

Terry Lee Stone, date of birth June 17, 1948, Social
Security Number 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, who resides at 19 Siera, San Anselmo,
CA, mailing address P.O. Box 492, Corte Madera, CA 94976, cellular
telephone number 714-588-1184, work telephone number 415-945-5420,
was interviewed in the office of the United States Attorney, Santa
Ana, CA.  Also present was FBI Special Agent William Bondurant and
Assistant United States Attorney Andrew Stolper.  Stone was advised
of the identity of the interviewing agent and the purpose of the
interview.  He then voluntarily provided the following information:

In 1999, Stone was working as a paralegal for a personal
injury attorney.  On or about March 22, 1999, Stone met Ken Ketner
at Arches restaurant in Newport Beach, CA.  Stone and Ketner
engaged in conversation, and by the end of the evening Ketner told
Stone he could offer Stone a better paying paralegal job at his
mortgage company.  Stone expressed interest in the offer, and
provided Ketner with contact information.

A few weeks later Stone was telephonically contacted by
an attorney named Allen Johnson.  Stone was interviewed and hired
by Johnson to work as Johnson's paralegal.  Johnson had an office
at Ketner's mortgage company, Mortgage Capital Resources (MCR),
located next to Ketner's office.  Ketner occupied the corner
office, and was in total control of MCR.  Johnson was acting as
legal in-house counsel for MCR.  Stone never worked on anything
suggesting that Johnson was Ketner's personal attorney.  As part of
his paralegal duties, Stone was never advised, nor did he perform
any duties, having to do with Ketner's personal legal issues.

Initially, Stone was tasked with representing MCR in
small claims court.  Periodically, borrowers would fail to make
initial loan payments to MCR.  This was usually due to confusion on
the borrowers' behalf.  Sometimes borrowers were required to make
initial payments directly to MCR until the loan was sold to or
funded by another lending institution.  This sometimes resulted in
confusion, and payments not being made.  Stone would then initiate
a small claims action.  Usually this resulted in the borrower
becoming aware of the misunderstanding and the issue would be
resolved.

Investigation on    02/18/2005    at   Santa Ana, CA

File #  29B-LA-224315                        Date dictated   03/21/2005
        SA Paul L. Bonin
by    SA William M. Bondurant/mab

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

EXHIBIT E 

FD-302a (Rev. 10-6-95)

29B-LA-224315
TERRY LEE STONE                                    02/18/2005

Continuation of FD-302 of _____, On _____, Page  2

        A short time later, Stone was summoned to a meeting with
Ketner and his (Ketner's) assistant, Roberta Martin.  It was
explained to Stone at this meeting that MCR was experiencing some
significant problems and it was Stone's new responsibility to deal
with issues regarding these problems.  Checks drawn on loan funds
issued to borrowers were bouncing.  Borrowers were calling MCR and
demanding explanations.  Stone was told he was now to be the point
of contact for these customers, to track complaints, and to devote
all of his time dealing with the issue.  Within one day of
receiving these duties, Stone received over 200 complaint calls.
Stone passed this information on to Ketner, but dealt mostly with
Roberta Martin.

        Stone's understanding of the loan funding process
suggested that no legitimate reason existed wherein funded loan
proceeds would not be available for their intended specified loan.

        Stone prepared a spread sheet depicting details of
customer complaints and bounced checks.  Stone then took note of
new funds available to MCR, and after consulting with Martin, made
recommendations on the disbursements of these new funds to cover
previous loans.  Stone does not know if Martin obtained input from
Ketner, or anyone else regarding these disbursements, but assumed
Ketner was making the decisions since Martin was his assistant.  At
some point Ketner told Stone that his (Stone's) primary duty was to
deal with customer complaints and satisfy previously made loans
with funds intended for new loans.  This was Stone's full time job
from the meeting until MCR closed.

        One day Stone went to Martin with his updated spreadsheet
and suggestions on which borrower should receive funds, but Martin
told Stone that it could no longer continue.  Stone then met with
Ketner who said MCR was going to declare bankruptcy.  Ketner told
Stone to find a small office somewhere from which the bankruptcy
proceedings could be conducted.  Later, Ketner told Stone to file
Chapter 11 on behalf of MCR.

        Stone maintained contact with Ketner after the Bankruptcy
filing.  Ketner told Stone to list one of the MCR vehicles, a
Mercedes, at a substantially reduced value on the bankruptcy
schedule.  Stone believed the Mercedes was valued at approximately
$36,000, but Ketner told Stone to list the value at $6,000.  Ketner
explained his purpose for undervaluing the asset was to allow a
friend to purchase the car at the reduced value.  Stone refused to
comply with Ketner's fraudulent request.

APR-13-2007  10:24                                                    P.25

FD-302a (Rev. 10-6-95)


29B-LA-224315
TERRY LEE STONE                                    02/18/2005

Continuation of FD-302 of _____ , On _____ , Page    3

      Along with payments for numerous Mercedes owned or leased
by MCR, Stone was aware of other questionable expenses paid by MCR.
Ketner was known to be intimately involved with another MCR
employee, Pam Stewart.  Ketner was married, and Stewart may have
been.  An apartment in Newport Beach was leased by MCR for what was
supposedly storage purposes.  This apartment actually served as a
"love shack" utilized by Stewart and Ketner.  Stewart worked at
MCR, but Stone never understood her exact role at the company.

      After MCR declared bankruptcy, Ketner and Stewart went to
work for another mortgage company called New American.  Stone
visited Ketner at New American to inquire about a job, but nothing
ever came of it.

      Stone met Cheryl Ketner on one or two occasions, but she
never worked at MCR.

      Stone was paid about $30,000 a year for his duties
described earlier.  He was paid by MCR, despite supposedly working
for Johnson.

      Stone heard mention of purple file properties, but never
understood issues relating to them.

      MCR maintained a large office in Atlanta.  During his
bankruptcy work, Stone could not locate any one at the Atlanta
office to obtain a list of assets and liabilities.

APR-13-2007  10:20                                              P.07

03/27/2001

      TERRY STONE, DOB 06/17/1948, SSN 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, 2522 Elden #B1, Costa Mesa, California, (949) 515-3635, was interviewed at the office of MORTGAGE CAPITAL RESOURCES (MCR), 3001 Red Hill Avenue, 1-204, Costa Mesa, California, (714) 513-1219.  STONE was previously aware of the identity of the interviewing agent and provided the following information.

      STONE was hired by MCR on 05/03/1999 as a paralegal. He was interviewed by ALAN JOHNSON, an attorney who worked with MCR.  STONE did not have any prior experience in the mortgage banking business.  His main focus at MCR was small claims actions.  STONE'S supervisor was ROBERTA MARTIN.

      Around May 2000, KENNETH KETNER asked STONE to field phone calls from borrowers whose funds had not cleared.  STONE received many phone calls from irate borrowers who desperately needed their loan money.  Between May and July, borrowers' checks were slowly being replaced, but after July, MCR ran out of money to fund the borrowers' replacement checks.  STONE does not know why borrowers' checks were bouncing and is not familiar with the flow of money at MCR.  At this point MCR fell apart, and in early September, KETNER asked STONE to set up MCR'S present office at 3001 Red Hill.

      KETNER resigned and sold his stock in MCR to PL MILLER on 01/03/2000, but stayed on as a consultant.

      STONE provided a corporate history on MCR, which is attached to this document.

03/26/2001      Costa Mesa, California

29B-LA-224315

SA John Connell

HPR-13-2007  10:20                                                          P.08

03/27/2001

ROGER LUBY, DOB 03/19/1936, SSN 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, 717 Santana Drive, Corona Del Mar, California, was interviewed at The Arches Restaurant in Newport Beach, California.  After being advised of the identity of the interviewing agent and the purpose of the interview, he provided the following information.

LUBY got involved with CFC Corporation in 1995 or 1996 to raise funds for the company.  He helped form MORTGAGE CAPITAL RESOURCE CORPORATION (MCR) by purchasing the assets of Mortgage Bankers Acceptance Corporation, after CFC went bankrupt.  LUBY owned 25% of MCR and KENNETH KETNER owned 60%.  In September 2000, LUBY resigned as President of MCR, MORTGAGE CAPITAL HOLDINGS (MCH) and MIOBI INVESTMENTS.  KETNER was LUBY'S predecessor in MCH and MIOBI.  LUBY does not have any records or documents related to these companies.

LUBY advised that PL MILLER stands for the name of his wife, PAM MILLER.  PL MILLER never had any bank accounts, employees or office space.  The sale of MCR stock to LUBY'S company, PL MILLER, never took place.

GARY TIMMERMAN of LaSalle Bank, who used to be with PNC Bank, is a good friend of KETNER'S.

LUBY stated that he and his wife purchased and sold several properties through KETNER as investments for tax write-offs.  LUBY acknowledged he purchased 14191 Green Vista Drive in Fontana, 29810 Via Viento in Menifee, and 811 W Avenue #J11 in Lancaster, and his wife purchased 2603 Cold Creek Avenue in Rosamond and 2717 Cold Creek Avenue in Rosamond.

03/16/2001        Newport Beach, CA

29B-LA-224315

SA John Connell

063

APR-13-2007  10:20                                                    P.11

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/18/2004

     Roger Luby, date of birth 3/19/1936, who resides at 717
Santana Drive, Corona Del Mar, CA, SSN 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, cellular
telephone number (949)300-5879, was interviewed at COCO's
restaurant in Newport Beach, CA.  Luby was advised of the identity
of the interviewing agent and the purpose of the interview.  He
then voluntarily provided the following information:

    In approximately 1998 or 1999, Ken Ketner approached Luby
about certain properties financed by Mortgage Capital Resources
(MCR).  Ketner explained that the properties were sold, but the
loan could not be sold by MCR because they were "improperly
packaged."  This implied that a problem with the loan package
existed making it impossible to sell.  Examples include missing
documents, incomplete files, or possible fraudulent information.
Ketner asked Luby to be a straw buyer for several of these
properties to clean up the paper work, making it more attractive to
a bank or investor.  Luby had nothing to do with the property to
include receiving rent payment, paying the monthly mortgage, or
future sale.  Luby's wife also acted as a straw buyer on several
properties at Ketner's request.  Luby complied with Ketner's
request, despite understanding the illegal nature of the action,
because he thought of Ketner as a friend.

    Paul Olivera is a long time associate of both Ketner and
Luby.  Olivera used to be a bookie, but does not do that anymore.
Olivera was Ketner's bookie,  Olivera lives part time in Newport
Beach, and part time in the Riverside area.  He frequents the Ritz
restaurant every Thursday for lunch.

    Luby had, and still has, tax problems dating back to
1977.  Because of these problems, Luby asked Ketner to help him
purchase a house in Newport Beach in 1991.  Luby asked Ketner to
act as his straw buyer to keep the IRS from knowing about the
purchase.  The house was about $350,000, and Luby put between
$10,000 and $20,000 down.  The money was Luby's, the payments were
made by Luby, and when the house was sold proceeds went to Luby.
On paper it appeared that Ketner was performing all of these
functions.  Luby took the appropriate tax adjustment for owning the
property despite it being in Ketner's name.
    Luby described Ketner as a Napoleonic character and a
control freak.  He often bragged about his sexual exploits,

---

Investigation on   6/18/2004   at  Newport Beach, Ca

File #  29B-LA-224315                          Date dictated  6/18/2004

by   SA Paul L. Bonin/plb

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

APR-13-2007   10:21                                                    P.12

FD-302a (Rev. 10-6-95)


29B-LA-224315


Continuation of FD-302 of ____ Roger Luby _____ , On 6/18/2004 , Page ___2___


including his affair with Pam Stewart.  Ketner ran the entire
operation at MCR.  Others with knowledge of what was going on at
MCR would be Pam Stewart, Roberta Martin and Beverly Flemming.

    Ketner lives in a house in Newport Beach that is in the
name of Paul Olivera.  Ketner frequents Billies At The Beach three
or four times a week in the afternoon.

    Luby agreed to cooperate with the FBI regarding this
investigation.

**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**



---

**In Re:**   KENNETH CHRISTOPHER KETNER   **Location:**   Santa Ana, CA
                                                                        United States Attorney's Office

**Investigation #:**   950430082
**Date:**   May 18, 2004
**Time:**   Approximately 1:40pm-5:00pm
**Participant(s):**   ALLEN JOHNSON, Witness / Subject
                              James Riddet, JOHNSON'S defense counsel
                              Andrew Stolper, AUSA
                              Paul Bonin, Special Agent - FBI
                              Eric J. Helfand, Special Agent

On the above stated date and time, ALLEN JOHNSON and his attorney James Riddet arrived at the United States Attorney's Office in Santa Ana, CA for the purpose of participating in a proffer session with Assistant United States Attorney (AUSA) Andrew Stolper, FBI Special Agent (SA) Paul Bonin, and IRS-CID Special Agent (SA) Eric Helfand. AUSA Stolper began the session by explaining to JOHNSON and Riddet the parameters of the meeting under the signed proffer agreement, and the expectations the government has of JOHNSON regarding the truthfulness of his statements. JOHNSON and Riddet stated they understood, and wished to continue with the session.

Following is a summary of the information provided by JOHNSON during the course of the interview:

1.  JOHNSON first met KEN KETNER in approximately 1985. At the time JOHNSON was a real estate developer in need of a mortgage lender to finance home buyers for a 138 unit development in Riverside, CA. After a casual conversation with an unidentified individual at the Los Angeles Federal Building, the individual gave JOHNSON KETNER'S business card, and told him KETNER was in the mortgage industry. JOHNSON subsequently contacted KETNER, who went on to provide financing for home buyers in JOHNSON'S Riverside development.

U.S. Treasury Criminal Investigation



2. JOHNSON again used KETNER as a mortgage lender for a 225 unit development in Riverside in the late 1980's.

3. JOHNSON learned that KETNER too had been a real estate developer, but went bankrupt in the late 1970's. After the failure of his real estate development business, KETNER founded California Financial Corporation (CFC), a mortgage lending business. JOHNSON stated that he later learned from Roberta Martin, KETNER'S executive assistant, that CFC was shut down because of financial problems, and that KETNER put liabilities of CFC in Martin's name.

4. In approximately 1990, JOHNSON moved from California to Texas because of the declining real estate market. JOHNSON purchased a 153 unit apartment building in Dallas as an investment, but found that the property was not what he had expected, and wanted to dispose of it soon after it was acquired. Because of the distressed area in which the building was located, JOHNSON had a difficult time selling it, and found it necessary to contact KETNER for a loan. JOHNSON stated that during the late 1980's, he had both a business and social relationship with KETNER, but that his move to Texas had halted there social contacts. KETNER agreed to loan JOHNSON $50,000, and delivered JOHNSON $25,000 on two occasions. JOHNSON recalled on one of those occasions meeting KETNER at Love Field in Dallas, where KETNER had flown in on a Lear Jet while on his way to New Orleans. JOHNSON could not recall if there was any documentation of the loan from KETNER.

5. JOHNSON returned from Texas to Temecula, CA, and began law school at Cal Western in San Diego. JOHNSON stated at this time his wife went back to graduate school, and his children were also in college.

JOHNSON'S establishment of Johnson & Dooley / Johnson & Payne, and business relationships with MCR and KETNER:

6. Upon graduating from law school JOHNSON stated that he desired to go into the securities industry, and participated in an internship program with the NASD. He stated that because of his age, he was not successful breaking into the securities sector, and subsequently had conversations with KETNER regarding employment opportunities. JOHNSON stated that KETNER was a mortgage banker, and that his business, Mortgage Capital Resources (MCR), had approximately 19 branch offices located in California, Arizona and Atlanta, GA. KETNER also told JOHNSON that MCR had access to $200 million of credit with which to fund loans. KETNER suggested to JOHNSON that he could handle small disputes that MCR had with brokers, and offered JOHNSON office space at Mortgage Capital Resources' executive office suite (located at 3 Hutton Center in Santa Ana, CA.), and $5,000/month salary. JOHNSON accepted KETNER'S proposal, and formed Johnson & Associates in approximately September 1998. At approximately this same time JOHNSON opened operating and client-trust accounts for Johnson & Associates at Sanwa Bank. JOHNSON stated that as an attorney he needed to have separate operating and client-trust accounts, and that this was standard practice for an attorney.

7. KETNER told JOHNSON that RANDY BRISTOL, manager of MCR's Atlanta operations, suggested that he (KETNER) contact JOHNSON to see if he was interested in becoming MCR's closing agent. In approximately December 1998 KETNER proposed to JOHNSON that he become the closing agent for MCR's Atlanta operations. JOHNSON stated he thought it was a requirement that the closing agent be an attorney, and that is why he was approached by KETNER. KETNER explained to JOHNSON that the previous closing agent was netting approximately $200,000/year, and that he and BRISTOL wanted JOHNSON to take over that role. KETNER also told JOHNSON that he and BRISTOL wanted a cut of the fees that MCR was going to pay JOHNSON. BRISTOL, JOHNSON, and KETNER reached an agreement where each would receive 1/3 of the fees that MCR paid to JOHNSON.

8. JOHNSON was not a licensed attorney in Georgia, and was not sure that he could perform closing agent duties for MCR's Atlanta operation. JOHNSON subsequently took a trip to Atlanta, and after visiting the Georgia State Bar, found that he could operate as a closing agent if he partnered with an attorney who was licensed in Georgia. JOHNSON met with attorney James Dooley, who had been performing limited closing agent duties for MCR, to discuss forming an association to become the primary closing agent for MCR. On this initial trip to Atlanta, JOHNSON also met with BRISTOL, who gave JOHNSON a tour of MCR's operation center. JOHNSON stated that it was a large facility set up specifically for a mortgage lending business. JOHNSON recalled that there were at least 3 teams of loan agents at the facility.

9. JOHNSON took a second trip to Atlanta, where he again met with Dooley, and offered him a position as an employee, with a salary of $100,000 plus benefits. JOHNSON also learned on this trip that MCR-Atlanta purchased the names of individuals with high credit-card balances, and sent out mass mailings offering debt consolidation loans. The majority of loans processed in the Atlanta office were debt consolidation loans ranging from approximately $20,000 to $40,000.

10. JOHNSON formed the business Johnson & Dooley (J&D) in approximately February 1999 for the specific purpose of serving as closing agent for MCR loans originated in MCR's Georgia, Florida, and Washington offices. BRISTOL, JOHNSON, and KETNER contributed $20,000 each to initially fund J&D's operations. MCR paid J&D $450 for each loan it closed. JOHNSON stated that J&D opened operating and client-trust accounts at Regions Bank for its closing agent duties. JOHNSON stated that at the beginning he didn't understand exactly what was required of a closing agent, and that Dooley performed the closing agent duties in Atlanta.

11. JOHNSON later came to understand J&D's initial role in the closing process as follows:

- Borrowers would apply for a loan from MCR.
- MCR would request loan funds from one its lines of credit with a warehouse lender.
- The warehouse lender would transfer the requested loan funds to J&D's client-trust account.
- J&D would disburse the loan funds directly to the borrower (or their designee).

12. JOHNSON hired Matt Heidari, a former employee of KETNER'S at CFC, as J&D's bookkeeper. Heidari worked at JOHNSON'S office at 3 Hutton Center in Santa Ana, CA. Heidari accompanied JOHNSON to Sanwa Bank, where JOHNSON authorized Sanwa to enable Heidari's computer at J&P in Santa Ana to be able to perform wire transfers. JOHNSON recalled that as a result of the visit to Sanwa, Heidari was able to initiate wire-transfers requests out of J&P's accounts, but if transfer requests exceeded a certain amount, JOHNSON would be contacted for confirmation of the request. JOHNSON identified Sanwa Bank employee Miriam Soto as the individual who helped set up the process.

13. After a short period of time, KETNER directed J&D to change the previously mentioned process so that J&D transferred loan funds directly to MCR's account at La Salle Bank, instead of directly to borrowers. JOHNSON agreed to follow KETNER'S directions, and at the time did not suspect that KETNER had ulterior motives for instituting the change. KETNER informed JOHNSON that MCR had purchased software that would enable it to process loan checks faster than J&D, and that MCR would now disburse loan funds to borrowers. JOHNSON stated that Dooley was "to slow" for MCR's liking, and thought this may have been a contributing factor in MCR acquiring the new software. KETNER'S loan funding instructions revised the process as follows:

- Borrowers would apply for a loan from MCR.
- MCR would request loan funds from one its lines of credit with a warehouse lender.
- The warehouse lender would transfer the requested loan funds to J&D's client-trust account.
- MCR employee Val Benincosa would advise J&D employee Heidari to transfer the loan funds in specific amounts to specific MCR accounts.

14. JOHNSON stated that Dooley continued on at J&D for a period of time after KETNER instituted the new procedures, but that eventually he and his wife (Michelle Dooley) moved from Atlanta, and JOHNSON was forced to find another attorney licensed in Georgia. JOHNSON replaced Dooley with attorney Robert Payne, who had replied to an advertisement placed by JOHNSON. JOHNSON stated that Payne had previously been employed as an attorney in the real estate industry. JOHNSON changed the name of the business to Johnson & Payne (J&P). JOHNSON stated that Heidari performed reconciliations on records he received from Payne relating to J&P's operations in Atlanta.

15. JOHNSON first became aware of financial problems at MCR in February or March of 2000. JOHNSON stated that checks MCR issued to J&P began to bounce. JOHNSON confronted KETNER about the bounced checks, and KETNER stated it was the bank's error, and that he would get it straightened out. It was also about this time period that JOHNSON began to hear around the office in 3 Hutton Center that MCR borrowers' loan checks were bouncing. JOHNSON stated that MCR customer complaints regarding bounced loan checks were routed to MCR employee Terry Stone. Heidari confirmed to JOHNSON that there was no money in MCR's accounts. JOHNSON stated that somehow Heidari got this information from his (Heidari's) computer at J&P.

16. In approximately March 2000, JOHNSON drafted a letter detailing MCR's funds transfer instructions to J&P. The letter explained how funds from MCR's warehouse lines of credit should be directed from J&P's account directly to the accounts of MCR. JOHNSON put the instructions on MCR's letterhead, and made it appear as if the letter had originally been from MCR's CEO KETNER to JOHNSON. JOHNSON backdated the letter to March 17, 1999. JOHNSON took the letter to KETNER'S assistant, Roberta Martin, and had her forge KETNER'S signature on the letter. JOHNSON stated KETNER was not happy when he received a copy of the letter JOHNSON had left with Martin. BRISTOL and Kevin Bonds (manager at MCR's Atlanta branch) did not receive copies of the letter as indicated on the letter's face. JOHNSON stated he had never received documentation from KETNER confirming his directions for J&P to transfer funds to MCR, and said he produced the letter in an effort to protect himself from future legal actions.

17. JOHNSON stated that KETNER met with MCR warehouse lender Regions Bank early in 2000 regarding MCR's line of credit with the institution. JOHNSON indicated that as a result of KETNER'S meeting, Regions Bank issued a new bailment agreement for MCR's line of credit, clarifying the funding process MCR was supposed to follow.

18. JOHNSON stated that during a conversation he had with KETNER after MCR's checks started bouncing, he told KETNER that he wanted to slow down J&P's role as closing agent to assess what the problems were. KETNER responded by saying, "Don't even think about it Al."

19. JOHNSON checked with Terry Stone to see if KETNER had solved the problem of bounced checks, and was informed by Stone that the problem had not been solved. In June 2000, JOHNSON directed Heidari to stop making wire transfers from J&P to MCR because MCR's checks to J&P, and to MCR's borrowers, were still bouncing. One day after directing Heidari to stop transfers to MCR, JOHNSON stated Heidari transferred funds to MCR on the direct orders of KETNER. JOHNSON again confronted KETNER, and accused him of stealing the money that J&P had transferred to MCR. KETNER responded to JOHNSON'S accusation by saying, "Al, I'm not taking it to fund my lifestyle.", and told JOHNSON not to worry and continue transferring funds from J&P to MCR.

20. In July 2000, JOHNSON again directed Heidari to stop making wire transfers from J&P to MCR, and again Heidari disobeyed JOHNSON'S orders, and transferred funds to MCR on the direct orders of KETNER. After this incident JOHNSON fired Heidari, and removed his authorization to perform transactions on any of J&P's bank accounts. JOHNSON had his longtime personal accountant, Peter Comoglio, take over Heidari's role at J&P. After reviewing J&P's financial records, Comoglio informed JOHNSON that wire transfers out of J&P's trust account had been used to pay for personal expenses of KETNER, and for operating expenses of MCR (i.e. payroll and payroll tax expenses). It was only after the review by Comoglio that JOHNSON became aware of the full scope of KETNER'S actions.

21. JOHNSON stated that KETNER met with officers of Household Finance in approximately July 2000 to discuss irregularities with MCR's line of credit with Household. Shortly after KETNER'S meeting with Household, KETNER gave a letter to JOHNSON stating that as a result of the meeting Household, J&P was now supposed to distribute loan funds to MCR's borrowers. JOHNSON stated the letter was actually a product of KETNER'S, and that the signature appearing on the letter is that of KETNER.

Details of fee-splitting scheme between BRISTOL, JOHNSON, and KETNER:

22. As mentioned previously, BRISTOL, JOHNSON, and KETNER entered into an agreement where each received 1/3 of the fees that MCR paid to J&D. JOHNSON informed BRISTOL and KETNER that it was illegal for him to share fees with them, at which point all three agreed that the money paid to BRISTOL and KETNER by J&D would be categorized as payments for "Advertising". JOHNSON stated that he thought the payments to BRISTOL and KETNER were for J&D getting MCR's business.

23. JOHNSON stated that he did not inform Dooley or Payne of the fee-splitting scheme between himself, BRISTOL, and KETNER because he knew it was against bar regulations, and he did not want to involve them.

24. BRISTOL and KETNER (particularly KETNER) told JOHNSON that they wanted the flexibility (i.e. concealment/tax evasion) of an international offshore account in which to deposit the "Advertising" payments. JOHNSON stated that coincidentally, about this same time, an unidentified MCR employee informed him that an attorney named Kevin Mirecki, who was also located at 3 Hutton Center, set up offshore bank accounts for individuals. JOHNSON stated that Mirecki's business, American International Corporate Services (AICS), specialized in asset protection.

25. Before JOHNSON offered additional information regarding his dealings with Mirecki, AUSA Stolper advised Riddet that any further information provided by JOHNSON could jeopardize his (JOHNSON'S) attorney-client privilege with Mirecki. Both AUSA Stolper and Riddet explained the privilege concept to JOHNSON, and further explained that it was JOHNSON'S prerogative to waive the privilege. JOHNSON acknowledged that he wanted to waive his privilege, and was willing to voluntarily provide information regarding his dealings with Mirecki.

26. JOHNSON met with Mirecki and explained to him in detail the fee-splitting arrangement that he, BRISOL, and KETNER had agreed upon. He also informed Mirecki of the fact that BRISTOL and KETNER had requested offshore bank accounts. JOHNSON informed Mirecki of the illegal nature of the "Advertising" transactions. Mirecki suggested to JOHNSON that they set up a shell company, and separate offshore accounts for BRISTOL and KETNER. He also suggested that JOHNSON make the "Advertising" payments to the shell company, and deposit the payments in the offshore accounts. Mirecki set up Ainsley Marketing Associates Ltd. (AMA) as the shell advertising company that JOHNSON would pay for the benefit of BRISTOL and KETNER. JOHNSON created a bogus business address for AMA (3 Dunwoody, Atlanta, GA). Mirecki set up one offshore account (Nevis) in the name of AMA for the benefit of KETNER, and one offshore account (Luxembourg) in the name of AMA for the benefit of BRISTOL. Under Mirecki's direction JOHNSON signed for, and was listed as the beneficial owner of, both offshore accounts. JOHNSON believed his name was also listed on the corporate documents that Mirecki drew up for AMA. After reviewing records in his possession, JOHNSON noted that J&P paid Mirecki fees of $4,410 (check #5273). JOHNSON kept BRISTOL and KETNER informed on the structure of the entity and accounts that Mirecki had set up, and both confirmed that it was what they wanted.

27. JOHNSON stated that BRISTOL and KETNER wanted access to the "Advertising" payments, and did not want the funds kept permanently offshore. JOHNSON was directed to set up nominee U.S. corporations, and bank accounts, in which to repatriate the "Advertising" payments made for the benefit of BRISTOL and KETNER. JOHNSON contacted Nevada attorney Gary Sutton to facilitate the formation of the required entities. JOHNSON was again admonished by AUSA Stolper and Riddet regarding his attorney-client privilege with Sutton, and JOHNSON again waived his right and offered information voluntarily. JOHNSON stated Sutton was not informed of the scheme, and

assumed that Sutton thought he was setting up legitimate corporations and accounts for JOHNSON. Sutton established the corporate entities The Good Company (BRISTOL), Joc Monet (KETNER), and accompanying bank accounts at Bank of the West. Sutton sent JOHNSON bank account signature cards to be signed by the individuals who were to have authority over the accounts. Prior to the cards being signed, KETNER approached JOHNSON and stated he had the perfect ID to use for the accounts. KETNER gave JOHNSON a State of Nevada identification with the name "Tony Alvarado", but a picture of Paul Olivera. JOHNSON knew Olivera as KETNER'S friend and bookie, and possibly an ex-felon. JOHNSON had accompanied KETNER and Olivera to Catalina Island on KETNER'S boat, where he overheard the two talking about bets that KETNER had placed. KETNER told JOHNSON that he had lost approximately $40,000 gambling the previous day. JOHNSON stated that KETNER'S assistant, Roberta Martin, practiced the signature of "Tony Alvarado", and was the individual who actually signed the bank signature cards. JOHNSON stated that "Tony Alvarado" was used as the nominee for both accounts (BRISTOL'S and KETNER'S) at Bank of the West. A signature stamp of Martin's forgery of "Tony Alvarado's" signature was made and given to BRISTOL and KETNER.

28. JOHSON detailed the flow of money associated with the "fee-splitting" scheme as follows:

- JOHNSON would write a check from J&D's (or J&P's) operating account to Ainsley Marketing Associates Ltd.
- JOHNSON would give the check to Mirecki.
- Mirecki would personally travel to Nevis, and deposit the check in the account he had previously established. The check represented both BRISTOL'S and KETNER'S share.
- 100% of the funds deposited in the Nevis account were subsequently wire-transferred to the Luxembourg account.
- 100% of the funds transferred to the Luxembourg account were subsequently wire-transferred to the accounts established at Bank of the West (50% to BRISTOL'S The Good Company account, 50% to KETNER'S Joc Monet account).

For a short period of time after the Bank of the West accounts had been established, JOHNSON retained custody of the respective check books, and would issue checks to BRISTOL and KETNER upon their request. However, in approximately September 1999 JOHNSON relinquished control of the check books to BRISTOL and KETNER.

29. At some later date, JOHNSON had a conversation with Richard Stenton, a business partner and/or attorney for KETNER, during which Stenton indicated that KETNER may have changed the ownership documentation to have himself listed as the owner of Joc Monet. Stenton stated to JOHNSON that KETNER may also have declared Joc Monet on his (KETNER'S) personal bankruptcy petition.

U.S. Treasury Criminal Investigation

30. After reviewing records in his possession, JOHNSON stated that a total of $705,000 worth of checks had been issued to AMA from J&D or J&P. JOHNSON stated the last check issued to AMA was on 4/5/2000 in the amount of $20,000. JOHNSON indicated that this was a settlement payment made to KETNER for the $50,000 KETNER had loaned to him for his apartment building investment property in Texas. JOHNSON also stated that out of the $705,000, he withheld $70,000 for legal fees he incurred as a result of his business association with KETNER.

JOHNSON'S role as straw-buyer for REO's:

31. KETNER explained to JOHNSON that MCR had to repossess certain real estate properties (REO's) in which MCR borrowers had defaulted. It was JOHNSON'S understanding that the REO's outstanding loan balances were greater than their market values, and that KETNER needed to "float" the outstanding loan balances until such time that their sales prices could at least extinguish the outstanding debt. JOHNSON consented to KETNER'S request to use his name on one of the above mentioned properties so that KETNER could generate a new loan, that would enable him to "float" the loan to another MCR line of credit. JOHNSON stated that KETNER only asked him directly on this one occasion, but he was aware that KETNER had used his name numerous times to facilitate similar transactions on other properties. JOHNSON was aware of this because Roberta Martin, KETNER'S secretary, asked him on numerous occasions to sign documentation for other properties. JOHNSON stated he saw individuals going in and out of Martin's office to sign papers on a monthly basis, and assumed it was also related to the REO's. Martin confirmed JOHNSON'S assumption by informing him that she was in charge of the monthly maintenance of the REO files.

32. JOHNSON stated he thought he was just helping out KETNER, and did not receive any benefit for allowing KETNER to use his name to "float" the properties.

Additional Information:

33. KETNER told JOHNSON that he and Pam Stewart had a sexual relationship, and JOHNSON recalled that KETNER and Stewart had vacationed together at the Four Seasons in Nevis.

34. JOHNSON'S last contact with KETNER was approximately 3 months ago at First Bank & Trust in Newport Beach. JOHNSON stated it is a coincidence that they both bank at the same branch, and the meeting was unplanned. Before this meeting, JOHNSON'S last contact with KETNER was approximately 3.5 years ago. During the most recent contact, KETNER told JOHNSON that he was still in the mortgage business.

35. JOHNSON recently tried to locate Mirecki, but was unsuccessful.

U.S. Treasury Criminal Investigation

I completed this memorandum on 5/25/2004, after refreshing my memory from notes made during and immediately after the interview with ALLEN JOHNSON.

Eric J. Helfand
Special Agent

U.S. Treasury Criminal Investigation

**Internal Revenue Service**
**Criminal Investigation**



**Memorandum of Interview**

---

| | |
|---|---|
| **In Re:** | KENNETH CHRISTOPHER KETNER   **Location:**   Santa Ana, CA |
| | United States Attorney's Office |

**Investigation #:** 950430082
**Date:** May 26, 2004
**Time:** Approximately 1:20pm-3:30pm
**Participant(s):** ALLEN JOHNSON , Witness / Subject
James Riddet, JOHNSON'S defense counsel
Andrew Stolper, AUSA
Paul Bonin, Special Agent - FBI
Eric J. Helfand, Special Agent

On the above stated date and time, ALLEN JOHNSON and his attorney James Riddet arrived at the United States Attorney's Office in Santa Ana, CA for the purpose of participating in a proffer session with Assistant United States Attorney (AUSA) Andrew Stolper, FBI Special Agent (SA) Paul Bonin, and IRS-CID Special Agent (SA) Eric Helfand. AUSA Stolper began the session by explaining to JOHNSON and Riddet the parameters of the meeting under the signed proffer agreement, and the expectations the government has of JOHNSON regarding the truthfulness of his statements. JOHNSON and Riddet stated they understood, and wished to continue with the session.

Following is a summary of the information provided by JOHNSON during the course of the interview:

1. Prior to any questions being asked of JOHNSON, Riddet raised the issue of attorney-client relationship between JOHNSON and KETNER. JOHNSON stated that he did not legally represent KETNER personally, and did not render legal advice to MCR. KETNER never asked JOHNSON for legal advice regarding his role as MCR's closing agent, or any other matters. JOHNSON stated that he never opened a client file on KETNER.

2. AUSA Stolper explained to JOHNSON and Riddet that the questions to be asked of JOHNSON were not intended to breach any attorney relationship that JOHNSON may, or may not, have had with KETNER.

3. JOHNSON provided the following personal information:
   - SSN#: 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
   - Date of Birth: 01/31/1947
   - Current Address: 3110 Park Newport, #307, Newport Beach, CA

JOHNSON has been legally separated from his wife of 30 years, Emilie Johnson, since 2002. Emilie Johnson currently resides in Corona Del Mar, and is employed by the environmental consulting firm Michael Brandman Associates, where she helps produce environmental impact reports. JOHNSON has a 23 year old son who recently graduated from UCLA, and a 25 year old daughter who lives in D.C., and works for a non-profit organization.

4. During some previous conversation, KETNER told JOHNSON that he (KETNER) took money from MCR in the same manner as he had at CFC, and that he couldn't believe that banks would continue to lend him money after CFC's failure. JOHNSON stated that KETNER seemed to brag about the fact that he was smarter than the banks, and that he again was able to obtain funds from the banks, even after he had just taken money from them at CFC.

5. Donald Petty, an employee at CFC and MCR, told JOHNSON that loan officers at MCR sometimes had to delay funding loans because funds were not available on MCR's lines-of-credit. Petty told JOHNSON that MCR's Bakersfield branch broke away from MCR because of this particular problem.

6. JOHNSON identified Beverly Fleming as the operations manager at MCR, and stated she has knowledge of MCR's operations and misconduct by KETNER.

7. JOHNSON again mentioned that KETNER was an avid gambler, and that he had 3 bookies. JOHNSON met one of the bookies, Paul Olivera, through social contact with KETNER, but did not know the identities of the other 2 bookies. JOHNSON believes that Olivera may have provided KETNER with money for his current residence located on Back Bay in Newport Beach.

8. KETNER told JOHNSON that RANDY BRISTOL made approximately $500,000 in 1998. KETNER left JOHNSON with the impression that approximately $200,000 of that income may not have been reported by BRISTOL, and that KETNER may somehow have facilitated the underreporting by BRISTOL. JOHNSON stated that KETNER informed him of this information when the issue of BRISTOL'S cooperation in the "fee-splitting" scheme came into question, and KETNER insinuated to JOHNSON that he (KETNER) had information that would persuade BRISTOL to cooperate.

9. During conversations that JOHNSON had with KETNER'S assistant Roberta Martin, Martin told JOHNSON that she thought KETNER may be doing the same thing at MCR that he did at CFC (running the business into bankruptcy). Martin also told JOHNSON that KETNER was originating multiple concurrent loans on REO's (Purple File Properties) towards the end of MCR's operating life.

10. KETNER asked JOHNSON to invest approximately $20,000 in a KETNER venture named HomeZipper.com.  JOHNSON declined the offer because it was made around the same time that he had discovered MCR's checks were bouncing, and he did not want to enter into another business arrangement with KETNER.  JOHNSON was not an investor in MCR, but he did identify insurance agent Richard Benter as being an investor in either MCR, or HomeZipper.com.

11. KETNER told JOHNSON that he purchased homes for his ex-wife Mary Francis Ketner, and for Roger Luby.  Prior to his association with MCR, Luby had owned (and sold) a mortgage business in Orange County, CA.  JOHNSON stated that before moving to Orange County, KETNER had lived in the Inland Empire, and that Luby had helped KETNER make contacts in the Orange County real estate industry.  At some point JOHNSON stated that KETNER asked Luby to become the figurehead chief of MCR, but JOHNSON did not know the details of the arrangement.  JOHNSON stated that KETNER was the leader of MCR as long as it was in operation.  During the collapse of MCR, Luby contacted JOHNSON, and asked if he (JOHNSON) was on good terms with KETNER.  JOHNSON told Luby that he and KETNER were not on good terms.

12. JOHNSON identified James Brakke as an original investor in MCR.  JOHNSON recognized the name Robert Herrera, but could not provide any additional information.

13. JOHNSON stated that he had no significant contact with MCR's accountants, Lesley, Thomas, Schwartz & Postma, although he may have visited their offices once while he was accompanying KETNER on some errands.

Information regarding offshore accounts and Kevin Mirecki:

14. JOHNSON stated that initially gave Mirecki $5,000 to deposit in the account established in Nevis to see if the routing from Nevis to Luxembourg to Nevada was going to work.  After JOHNSON verified that the transfer of money had been successful, he gave Mirecki larger amounts to deposit in the same manner.  JOHNSON stated that the "fee-splitting" arrangement was based upon Johnson & Payne's (J&P) net profit, and that BRISTOL, JOHNSON, and KETNER split the net profit equally.  Matt Heidari provided JOHNSON with J&P's net profit information.  JOHNSON would subsequently cut checks to Ainsley Marketing Associates Ltd. for the benefit of BRISTOL and KETNER.  JOHNSON would then deliver the checks to Mirecki, who would then overnight the funds to Nevis for deposit.

15. JOHNSON stated the transfer of funds between Nevis, Luxembourg, and Nevada was done per his standing orders at the banks.  JOHNSON spoke with representatives at the Bank of Nevis on a couple of occasions, and also spoke with representatives at the bank in Luxembourg regarding setting up the

U.S. Treasury Criminal Investigation

account, and also about the transfer of funds.

16. JOHNSON believed that he was the only point of contact with Mirecki, and that BRISTOL and KETNER did not have contact with him. JOHNSON recalled Mirecki's office having 1 receptionist and 2 other employees, one of which may have been a legal secretary, and the other who may have been involved in running American International Corporate Services (AICS).

17. JOHNSON stated a copy of the fraudulent identification card, used to open the Bank of the West accounts for BRISTOL and KETNER, was sent to the bank along with signature cards.

18. JOHNSON stated that he has never had an offshore bank account.

<u>Additional information pertaining to KETNER:</u>

19. JOHNSON identified KETNER'S assets (in 2000) as follows:
    - Personal residence on Lido Island in Newport Beach
    - 1 - 38' sail boat
    - 1 – ski boat
    - 1 – 35' to 40' cabin cruiser
    - 1 – Ferrari
    - 2 – Mercedes SL 600's
    - 1 – Ford Explorer
    - 1 – Infiniti SUV
    - Apartment on N. side of Newport Center that he and Pam Stewart used.

20. KETNER told JOHNSON that he had sexual relationships with Pam Stewart and Roberta Martin.

21. JOHNSON stated that attorney Howard Larsen had helped his wife set up a legitimate trust account, and that JOHNSON had introduced KETNER to Larsen. JOHNSON believes KETNER tried to use Larsen to set up another offshore entity, this time in the Cayman Islands.

<u>Tax Information:</u>

22. The payments JOHNSON made to Ainsley Marketing Associates Ltd., for the benefit of BRISTOL and KETNER, were classified as "Advertising Expenses" on J&P's books. JOHNSON admitted that the amount of advertising expense listed on J&P's corporate tax returns was false, and that the corporate tax returns filed by J&P were not true and accurate.

23. JOHNSON stated that he had no income while attending law school, or after closing J&P, and that his personal income tax returns are correct.

I completed this memorandum on 06/08/2004, after refreshing my memory from notes made during and immediately after the interview with ALLEN JOHNSON.

Eric J. Helfand
Special Agent

COPY

1   DEBRA W. YANG
    United States Attorney
2   WAYNE GROSS
    Assistant United States Attorney
3   Chief, Southern Division
    ANDREW STOLPER
4   Assistant United States Attorney
    California Bar Number:   [205462]
5        United States Courthouse
         411 West Fourth Street
6        Santa Ana, California 92701
         Telephone: (714) 338-3536
7        Facsimile: (714) 338-3708

8   Attorney for Plaintiff
    United States of America

9

10              UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,    ) SA CR 05-36-JVS
                                 )
13              Plaintiff,       )
                                 ) PLEA AGREEMENT FOR DEFENDANT
14        v.                     ) ALLEN JOHNSON
                                 )
15  ALLEN JOHNSON,               )
                                 )
16              Defendant.       )
                                 )
17                               )

18  _____

19       1.   This constitutes the plea agreement between ALLEN

20  JOHNSON ("defendant") and the United States Attorney's Office for

21  the Central District of California ("the USAO") in the above-

22  captioned case.  This agreement is limited to the USAO and cannot

23  bind any other federal, state or local prosecuting,

24  administrative or regulatory authorities.

25                              PLEA

26       2.   Defendant agrees to plead guilty to counts 2-7 and 15 of

27  the indictment in United States v. Allen Johnson, No. SA CR 05-

28  36-JVS.

081

## NATURE OF THE OFFENSE

3. In order for defendant to be guilty of counts two through seven which charge violations of Title 18, United States Code, Sections 1343 and 1346 the following must be true:

(1) the defendant knowingly carried out a scheme or plan to deprive warehouse lenders of their intangible right of honest services;

(2) Second, the defendant acted with the intent to deprive the warehouse lenders of the intangible right of honest services; and

(3) the defendant used, or caused someone to use, wire communications in commerce to carry out or to attempt to carry out the scheme or plan.

As to Count Fifteen, which charges a violation 18 U.S.C. § 1956(h) the following must be true:

(1) There was an agreement between two or more persons to commit at least one crime as charged in the indictment;

(2) The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it. Defendant admits that defendant is, in fact, guilty of these offenses as described in the indictment.

## PENALTIES AND RESTITUTION

4. The statutory maximum sentence that the Court can impose for each violation of Title 18, United States Code, Section 1343 is: 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss

2

082

1  resulting from the offense, whichever is greatest; and a
2  mandatory special assessment of $100.  The statutory maximum
3  sentence that the Court can impose for each violation of Title
4  18, United States Code, Section 1956(h) is: 10 years
5  imprisonment; a 3-year period of supervised release; a fine of
6  $250,000 or twice the gross gain or gross loss resulting from the
7  offense, whichever is greatest; and a mandatory special
8  assessment of $100.  Therefore, the total maximum sentence for
9  all offenses to which defendant is pleading guilty is: 40 years
10 imprisonment; a 3-year period of supervised release; a fine of
11 $1,750,000 or twice the gross gain or gross loss resulting from
12 the offenses, whichever is greatest; and a mandatory special
13 assessment of $700.

14    5.   Defendant understands that defendant will be required
15 to pay full restitution to the victim of the offenses.  Defendant
16 agrees that, in return for the USAO's compliance with its
17 obligations under this agreement, the amount of restitution is
18 not restricted to the amounts alleged in the counts to which
19 defendant is pleading guilty and may include losses arising from
20 charges not prosecuted pursuant to this agreement as well as all
21 relevant conduct in connection with those charges.  Defendant
22 further agrees that defendant will not seek the discharge of any
23 restitution obligation, in whole or in part, in any present or
24 future bankruptcy proceeding.

25    6.   Supervised release is a period of time following
26 imprisonment during which defendant will be subject to various

27
28                              3

1   restrictions and requirements.   Defendant understands that if

2   defendant violates one or more of the conditions of any

3   supervised release imposed, defendant may be returned to prison

4   for all or part of the term of supervised release, which could

5   result in defendant serving a total term of imprisonment greater

6   that the statutory maximum stated above.

7        7.   Defendant also understands that, by pleading guilty,

8   defendant may be giving up valuable government benefits and

9   valuable civic rights, such as the right to vote, the right to

10  possess a firearm, the right to hold office, and the right to

11  serve on a jury.

12       8.   Defendant further understands that the conviction in

13  this case may subject defendant to various collateral

14  consequences, including but not limited to, disbarment,

15  deportation, revocation of probation, parole, or supervised

16  release in another case, and suspension or revocation of a

17  professional license.   Defendant understands that unanticipated

18  collateral consequences will not serve as grounds to withdraw

19  defendant's guilty plea.

20                           FACTUAL BASIS

21       9.   Defendant and the USAO agree and stipulate to the

22  statement of facts provided below.   This statement of facts

23  includes facts sufficient to support a pleas of guilty to the

24  charges described in this agreement and to establish the

25  sentencing guideline factors set forth in paragraph 11 below.   It

26  is not meant to be, and is not, a complete recitation of all

27

28                              4

084

1  facts relevant to the underlying criminal conduct or all facts

2  known to defendant that relate to that conduct.

3      Defendant JOHNSON was asked by defendant Kenneth Ketner
   ("Ketner") to go to work with his company, Mortgage Capital
4  Resources ("MCR") in 1998.  JOHNSON, a recent law school
   graduate, had known Ketner since 1985 and had business dealings
5  with him on and off since that time.  As long as JOHNSON had
   known Ketner, Johnson had been a homebuilder, and Ketner was a
6  mortgage banker who was an expert in the home loan field.

7      At the time Ketner asked JOHNSON to go to work, and until
   MCR went out of business, Ketner was in complete charge of MCR.
   MCR was in the business of originating home loans and then
8  funding them off pre-existing warehouse lines of credit.  Ketner
   asked JOHNSON to serve as closing agent for MCR's Atlanta,
9  Georgia, loan office.  Ketner explained that MCR's Atlanta office
   did a volume business in small, $35,000 to $50,000 home equity
10 loans, and was paying their present closing agent $200,000 per
   year to do MCR's Atlanta's closings.

11     Ketner proposed that in exchange for his steering MCR's
   business to JOHNSON, that JOHNSON would split the net profits
12 from the closings between himself, Ketner, and another employee
   of MCR.

13     JOHNSON, Ketner, and the other MCR employee decided to go
   forward with the arrangement.  JOHNSON associated himself with
14 MCR's existing Georgia closing attorney, reduced his salary to
   $100,000, and had the attorney continue to close MCR's Atlanta
15 branch loans as before.

16     Although JOHNSON was supposed to serve as a neutral third
   party between the lenders including MCR, and the borrowers, he
   shared his closing fees with Ketner.  When JOHNSON first took
17 over the closing duties, the closings were done in the following
   manner: (1) borrowers would apply for a loan from MCR; (2) MCR
18 would request loan funds from one of its warehouse lenders; (3) A
   warehouse lender would transfer the requested funds to
19 defendant's JOHNSON's client trust account; and (4) JOHNSON would
   confirm the transaction met certain requirements and disburse the
20 funds directly to the borrower or their designees.

21     Shortly after JOHNSON took over the closing duties he and
   Ketner changed the arrangement such that JOHNSON no longer
   disbursed the money.  Instead, it would be sent to MCR who was
22 supposed to disburse it to the borrowers.  As part of this
   arrangement, Ketner would tell one of JOHNSON's employees what
23 money to wire and when.

24     In February or March of 2000, as the loan volume increased,
   it became clear to JOHNSON that KETNER was not funding loans with
   the warehouse lender's money that was transferred from his
25 account to MCR's.  He learned this because he heard from people
   at MCR that borrowers were complaining that their checks were
26 bouncing.  In March, 2000, JOHNSON drafted a letter purportedly
   from Ketner to himself backdated to March 17, 1999 which stated

27

28                              5

that JOHNSON was supposed to wire the money he received from the warehouse lenders to MCR who would then fund loans.   JOHNSON had Ketner's assistant sign Ketner's signature on the document, telling her that Ketner approved of her doing so.   JOHNSON drafted this letter because he was worried Ketner would deny he was behind the new and illegal funding arrangement.   JOHNSON provided a copy of the letter to Ketner who was not happy with the fact JOHNSON had written down what their arrangement was, but did not dispute the fact that MCR had been receiving the warehouse lender's money.

Once JOHNSON learned that Ketner was misappropriating the warehouse lender's money, he confronted Ketner.   Ketner told JOHNSON that there was a problem with the banks and that he needed time to meet with them to work the problems out.   JOHNSON then asked his in-house CPA what was going on.   The in-house CPA, who had access to MCR's account balances, told JOHNSON that all the money in MCR's funding account was gone, despite the fact that there should have been money in the account to fund numerous home equity loans.   JOHNSON told Ketner that he wanted to cease the flow of money from to MCR to assess the problem.   In response, Ketner said "Don't even think about it, Al."

Ketner insisted that, given time, he could work out the problems with the banks.   Based on this promise, JOHNSON continued to send money directly to MCR's accounts from his account, rather than to close the loans himself as he was obligated to do as the closing agent.

Finally, in July of 2000, JOHNSON shut down Ketner's ability to wire money from his account.   In total, over $7 million of the money JOHNSON received from Household was wired from his account to MCR and then not used to fund loans.

During the time JOHNSON was the closing agent he continued to split his closing fees with Ketner.   Neither JOHNSON nor Ketner wanted the money JOHNSON was paying to Ketner to be traced back to JOHNSON.   Ketner also told JOHNSON he wanted the "flexibility" of an offshore account.   Ketner and JOHNSON agreed to treat the payments as advertising expenses.   JOHNSON learned that an attorney in the same building that he and Ketner worked— 3 Hutton Center, in Santa Ana, California— might be of assistance in concealing the money, sending it offshore, and repatriating it if necessary.

JOHNSON, with Ketner's knowledge and consent, set up a shell companies called "Ainsley Marketing Associates Ltd." and "Sunbeam Sales Corp."   JOHNSON, again with Ketner's knowledge and consent, then set up bank accounts at Bank of Nevis International Ltd. and at Banque Internationale A Luxembourg.   On June 15, 1999 JOHNSON, with Ketner's knowledge, incorporated the "Good Corporation," a Nevada Corporation.   On June 28, 1999 they incorporated "Joc Monet.com", also a Nevada Corporation.   The next month JOHNSON, with Ketner's permission, set up bank accounts in the names of these shell companies at Heritage Bank of Nevada.   A natural person has to be the signatory on the account.   Neither Ketner nor JOHNSON wanted to be that signatory.   To resolve this problem

6

Ketner obtained a false identification from his longtime friend and bookie.  The name on this identification, and the signatory on the accounts, is "Paul Hernandez."

In June, 1999 JOHNSON, with Ketner's knowledge and consent, did a test transaction.  JOHNSON caused a $5,000 made out to "Ainsley Marketing Associates Ltd." to be deposited in the Nevis bank account.  On August 23, 1999 $2,465 was wired from Banque Internationale A Luxembourg to both the "Good Corporation" and "Joc Monet.com" bank accounts at Heritage Bank of Nevada.  Over the next ten months Ketner and JOHNSON caused 11 checks to be written Ainsley Marketing Associates Ltd. totaling $705,000.  Of that money, $526,430 was wired to the Heritage Bank of Nevada accounts.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

9.   By pleading guilty, defendant gives up the following rights:

a) The right to persist in a plea of not guilty.

b) The right to a speedy and public trial by jury.

c) The right to the assistance of legal counsel at trial, including the right to have the Court appoint counsel for defendant for the purpose of representation at trial.  (In this regard, defendant understands that, despite his or her plea of guilty, he or she retains the right to be represented by counsel – and, if necessary, to have the court appoint counsel if defendant cannot afford counsel – at every other stage of the proceedings.)

d)   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e)   The right to confront and cross-examine witnesses against defendant.

f)   The right, if defendant wished, to testify on defendant's own behalf and present evidence in opposition to the

7

1  charges, including the right to call witnesses and to subpoena

2  those witnesses to testify.

3       g) The right not to be compelled to testify, and, if

4  defendant chose not to testify or present evidence, to have that

5  choice not be used against defendant.

6       By pleading guilty, defendant also gives up any and all

7  rights to pursue any affirmative defenses, Fourth Amendment or

8  Fifth Amendment claims, and other pretrial motions that have been

9  filed or could be filed.

10                         SENTENCING FACTORS

11      10.  Defendant understands that the Court is required to

12  consider the United States Sentencing Guidelines ("U.S.S.G." or

13  "Sentencing Guidelines") among other factors in determining

14  defendant's sentence.  Defendant understands, however, that the

15  Sentencing Guidelines are only advisory, and that after

16  considering the Sentencing Guidelines, the Court may be free to

17  exercise its discretion to impose any reasonable sentence up to

18  the maximum set by statute for the crimes of conviction.

19      11.  Defendant and the USAO agree and stipulate to the

20  following applicable sentencing guideline factors using the 1998

21  Edition of the Guidelines:

22  **Wire Fraud**

23      Base Offense Level  :      6      [U.S.S.G. § 2F1.1]

24      Specific Offense
        Characteristics

25

26      Loss greater than
        $5 million          :      14     [U.S.S.G. § 2F1.1(b)(1)]

27

28                                   8

| | | | |
|---|---|---|---|
| More than Minimal Planning | : | __2__ | [U.S.S.G. § 2F1.1(b)(2)] |
| Subtotal for Offense | : | __22__ | |

**Money Laundering Conspiracy**

| | | | |
|---|---|---|---|
| Base Offense Level | : | __20__ | [U.S.S.G. § 2S1.1] |
| Specific Offense Characteristics | | | |
| Funds exceeded $600,000 | : | __4__ | [U.S.S.G. § 2F1.1(b)(1)] |
| Subtotal for Offense | : | __24__ | |

**Grouping Calculations**

| | | |
|---|---|---|
| Pre-grouping subtotal | : | __24__ |
| Grouping adjustment | : | __+2__ |
| Offense level before adjustments or departures | : | __26__ |

Defendant reserve the right to argue that additional specific offense characteristics, adjustments and departures are appropriate. The USAO agrees not to seek additional specific offense characteristics, adjustments, or departures except as described in this agreement.

12. There is no agreement as to defendant's criminal history or criminal history category.

13. The stipulations in this agreement do not bind either the United States Probation Office or the Court. Both defendant and the USAO are free to: (a) supplement the facts by supplying

9

1  relevant information to the United States Probation Office and

2  the Court, (b) correct any and all factual misstatements relating

3  to the calculation of the sentence, and (c) argue on appeal and

4  collateral review that the Court's sentencing calculations are

5  not error, although each party agrees to maintain its view that

6  the calculations in paragraph 11 are consistent with the facts of

7  this case.

8  <u>DEFENDANT'S OBLIGATIONS</u>

9      14.  Defendant agrees that he or she will:

10          a) Plead guilty as set forth in this agreement.

11          b) Not knowingly and willfully fail to abide by all

12  sentencing stipulations contained in this agreement.

13          c) Not knowingly and willfully fail to: (i) appear as

14  ordered for all court appearances, (ii) surrender as ordered for

15  service of sentence, (iii) obey all conditions of any bond, and

16  (iv) obey any other ongoing court order in this matter.

17          d) Not commit any crime; however, offenses which would

18  be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are

19  not within the scope of this agreement.

20          e) Not knowingly and willfully fail to be truthful at

21  all times with Pretrial Services, the U.S. Probation Office, and

22  the Court.

23          f) Pay the applicable special assessments at or before

24  the time of sentencing unless defendant lacks the ability to pay.

25      15.  Defendant further agrees:

26          a) To disclose to law enforcement officials, at a date

27

28                              10

090

1   and time to be set by the USAO, the whereabouts of, defendant's

2   ownership interest in, and all other information known to

3   defendant about, all monies, property or assets of any kind,

4   derived from or acquired as a result of, or used to facilitate

5   the commission of, defendant's illegal activities, and to forfeit

6   all right, title, and interest in and to such items.

7           b) To the Court's entry of an order of forfeiture at or

8   before sentencing with respect to these assets and to the

9   forfeiture of the assets.

10          c) To take whatever steps are necessary to pass to the

11  United States clear title to the assets described above,

12  including, without limitation, the execution of a consent decree

13  of forfeiture and the completing of any other legal documents

14  required for the transfer of title to the United States.

15          d) Not to contest any administrative forfeiture

16  proceedings or civil judicial proceedings commenced against these

17  properties.  With respect to any criminal forfeiture ordered as a

18  result of this plea agreement, defendant  waives the requirements

19  of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding

20  notice of the forfeiture in the charging instrument,

21  announcements of the forfeiture sentencing, and incorporation of

22  the forfeiture in the judgment.  Defendant acknowledges that

23  forfeiture of the assets is part of the sentence that may be

24  imposed in this case and waives any failure by the court to

25  advise defendant of this, pursuant to Rule 11(b)(1)(J), at the

26  time defendant's guilty plea is accepted.

27

28                          11

e) Not to assist any other individual in any effort falsely to contest the forfeiture of the assets described above.

f) Not to claim that reasonable cause to seize the assets was lacking.

g) To prevent the disbursement of any and all assets described above if such disbursements are within defendant's direct or indirect control.

h) To fill out and deliver to the USAO a completed financial statement listing defendant's assets on a form provided by the United States Attorney's Office.

i) That forfeiture of assets described above shall not be counted toward satisfaction of any special assessment, fine, restitution, or any other penalty the Court may impose.

16. Defendant further agrees to cooperate fully with the USAO, the FBI and IRS Criminal Investigation Divison, and, as directed by the USAO, any other federal, state, or local or foreign law enforcement agency. This cooperation requires defendant to:

a) Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

b) Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

c) Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO,

12

1  or its designee, inquires.

2                    THE USAO'S OBLIGATIONS

3      17.  If defendant complies fully with all defendant's

4  obligations under this agreement, the USAO agrees:

5          a) To abide by all sentencing stipulations contained in

6  this agreement.

7          b) At the time of sentencing to move to dismiss the

8  remaining counts of the indictment.  Defendant agrees, however,

9  that at the time of sentencing the Court may consider the

10 dismissed count[s] in determining the applicable Sentencing

11 Guidelines range, where the sentence should fall within that

12 range, and the propriety and extent of any departure from that

13 range.

14         c) At the time of sentencing, provided that defendant

15 demonstrates an acceptance of responsibility for the offenses up

16 to and including the time of sentencing, to recommend a two-level

17 reduction in the applicable sentencing guideline offense level,

18 pursuant to U.S.S.G. § 3E1.1, and to recommend and, if necessary,

19 move for an additional one-level reduction if available under

20 that section.

21         d)  Not to offer as evidence in its case-in-chief in

22 the above-captioned case or any other prosecution that may be

23 brought against defendant by the USAO, or in connection with any

24 sentencing proceeding in any case that may be brought against

25 defendant by the USAO, any statements made by defendant or

26 documents, records, or tangible evidence provided by defendant

27

28                              13

1  pursuant to this agreement or the letter agreements previously

2  entered into by the parties dated May 6 and 26, 2004 ("the Letter

3  Agreements"). Defendant agrees, however, that the USAO may use

4  such statements, documents, records, and tangible evidence: (1)

5  to obtain and pursue leads to other evidence, which evidence may

6  be used for any purpose, including any prosecution of defendant,

7  (2) to cross-examine defendant should defendant testify, or to

8  rebut any evidence, argument or representations made by defendant

9  or a witness called by defendant in any trial, sentencing

10  hearing, or other court proceeding, and (3) in any prosecution of

11  defendant for false statement, obstruction of justice, or

12  perjury.

13        e)  Not to use any information provided by defendant

14  pursuant to this agreement or the Letter Agreements against

15  defendant at sentencing for the purpose of determining the

16  applicable guideline range, including the appropriateness of an

17  upward departure, and to recommend to the Court that such

18  information not be used in determining the point in the

19  Sentencing Guidelines range at which defendant should be

20  sentenced. Defendant understands, however, that information

21  provided by defendant pursuant to this agreement or the Letter

22  Agreements will be disclosed to the probation office and the

23  Court, and that the Court may use this information for the

24  purposes set forth in U.S.S.G § 1B1.8(b).

25        f)  In connection with defendant's sentencing, to

26  bring to the Court's attention the nature and extent of

27

28                  14

1  defendant's cooperation.

2              g)    If the USAO determines, in its exclusive judgment,

3  that defendant has both complied with his or her obligations

4  under paragraphs 15 and 16 above and provided substantial

5  assistance to law enforcement in the prosecution or investigation

6  of another ("substantial assistance"), to move the Court pursuant

7  to U.S.S.G. § 5K1.1 to impose a sentence below the sentencing

8  range otherwise dictated by the sentencing guidelines.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                          15

<u>DEFENDANT'S UNDERSTANDINGS REGARDING SUBSTANTIAL ASSISTANCE</u>

18.   Defendant understands the following:

a)   Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b)   Nothing in this agreement requires the USAO or any other prosecuting or law enforcement agency to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c)   Defendant cannot withdraw defendant's guilty pleas if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced sentence or if the USAO makes such a motion and the Court does not grant it.

d)   At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes substantial assistance.   The decision whether defendant has provided substantial assistance rests solely within the discretion of the USAO.

e)   The USAO's determination of whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies.

<div align="center"><u>BREACH OF AGREEMENT</u></div>

19.   If defendant, at any time between the execution of this

<div align="center">16</div>

agreement and the completion of defendant's cooperation pursuant
to the agreement or defendant's sentencing on a non-custodial
sentence or surrender for service on a custodial sentence,
whichever is later, knowingly violates or fails to perform any of
defendant's obligations under this agreement ("a breach"), the
USAO may declare this agreement breached.  For example, if the
defendant knowingly in an interview, before a grand jury, or at
trial, falsely accuses another person of criminal conduct or
falsely minimizes his (or her) own role, or the role of another,
in criminal conduct, he will have breached this agreement.  If
the USAO declares this agreement breached, and the Court finds
such a breach to have occurred, defendant will not be able to
withdraw defendant's guilty plea[s], and the USAO will be
relieved of all of its obligations under this agreement.  In
particular:

a)   The USAO will no longer be bound by any agreements
concerning sentencing and will be free to seek any sentence up to
the statutory maximum for the crime[s] to which defendant has
pleaded guilty.

b)   The USAO will no longer be bound by any agreements
regarding criminal prosecution, and will be free to prosecute
defendant for any crime[, including charges that the USAO would
otherwise have been obligated [to dismiss] [or] [not to
prosecute] pursuant to this agreement].

c)   The USAO will be free to prosecute defendant for
false statement, obstruction of justice, and perjury based on any

17

1 knowingly false or misleading statement by defendant.

2         d)   The USAO will no longer be bound by any agreement

3 regarding the use of statements, documents, records, tangible

4 evidence, or information provided by defendant, and will be free

5 to use any of those in any way in any investigation, prosecution,

6 or civil or administrative action.   Defendant will not be able to

7 assert either (1) that those statements, documents, records,

8 tangible evidence, or information were obtained in violation of

9 the Fifth Amendment privilege against compelled self-

10 incrimination, or (2) any claim under the United States

11 Constitution, any statute, Rule 11(f) of the Federal Rules of

12 Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or

13 any other federal rule, that statements, documents, records,

14 tangible evidence, or information provided by defendant before or

15 after the signing of this agreement, or any leads derived

16 therefrom, should be inadmissible.

17     20.   Following a knowing and willful breach of this

18 agreement by defendant, should the USAO elect to pursue any

19 charge that was dismissed or not filed as a result of this

20 agreement, then:

21         a) Defendant agrees that any applicable statute of

22 limitations is tolled between the date of defendant's signing of

23 this agreement and the commencement of any such prosecution or

24 action.

25         b) Defendant gives up all defenses based on the statute

26 of limitations, any claim of preindictment delay, or any speedy

27

28                          18

1  trial claim with respect to any such prosecution, except to the

2  extent that such defenses existed as of the date of defendant's

3  signing of this agreement.

4      <u>LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK</u>

5      21.   Defendant gives up the right to appeal any sentence

6  imposed by the Court and the manner in which the sentence is

7  determined, provided that (a) the sentence is within the

8  statutory maximum specified above and is constitutional, and (b)

9  the Court imposes sentence by applying the guidelines, does not

10 depart upward in offense level or criminal history category, and

11 determines that the total offense level is 23 or below, and

12 imposes a sentence within the range corresponding to the

13 determined total offense level and criminal history category.

14 Defendant also gives up any right to bring a post-conviction

15 collateral attack on the convictions or sentence, except a post-

16 conviction collateral attack based on a claim of ineffective

17 assistance of counsel, a claim of newly discovered evidence, or a

18 explicitly retroactive change in the applicable Sentencing

19 Guidelines, sentencing statutes, or statutes of conviction.

20 Notwithstanding the foregoing, defendant retains the ability to

21 appeal the court's determination of defendant's criminal history

22 category and the conditions of supervised release imposed by the

23 court, with the exception of the following: standard conditions

24 set forth in district court General Orders 318 and 01-05; the

25 drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and

26 3583(d); and the alcohol and drug use conditions authorized by 18

27

28                         19

1 U.S.C. § 3563(b)(7).  Defendant also retains the right to appeal
2 any order of restitution.
3      22.  The USAO gives up its right to appeal the Court's
4 Sentencing Guidelines calculations, provided that (a) the Court
5 does not depart downward in offense level or criminal history
6 category (except by a downward departure in offense level
7 pursuant to, and to the extent requested by, the USAO in a motion
8 under U.S.S.G. § 5K1.1) and (b) the Court determines that the
9 total offense level is 23 or above prior to any departure under
10 U.S.S.G. § 5K1.1 and imposes a sentence within the range
11 corresponding to the determined total offense level (after any
12 downward departure under U.S.S.G. § 5K1.1 and criminal history
13 category).
14                 RESULT OF VACATUR, REVERSAL OR SET-ASIDE
15      23.  Defendant agrees that if any count of conviction is
16 vacated, reversed, or set aside the USAO may: (a) ask the Court
17 to resentence defendant on any remaining counts of conviction,
18 with both the USAO and defendant being released from any
19 stipulations regarding sentencing contained in this agreement,
20 (b) ask the Court to void the entire plea agreement and vacate
21 defendant's guilty pleas on any remaining counts of conviction,
22 with both the USAO and defendant being released from all of their
23 obligations under this agreement, or (c) leave defendant's
24 remaining convictions, sentence, and plea agreement intact.
25 Defendant agrees that the choice among these three options rests
26 in the exclusive discretion of the USAO.
27
28                                20

## COURT NOT A PARTY

24.   The Court is not a party to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' stipulations.  Even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from any stipulation, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  No one – not the prosecutor, defendant's attorney, or the Court – can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

## NO ADDITIONAL AGREEMENTS

25.   Except as set forth herein, there are no promises, understandings or agreements between the USAO and defendant or defendant's counsel.  This agreement supersedes and replaces the Letter Agreements.  Nor may any additional agreement, understanding or condition be entered into unless in a writing signed by all parties or on the record in court.

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

26.   The parties agree and stipulate that this Agreement will be considered part of the record of defendant's guilty plea hearing as if the entire Agreement had been read into the record of the proceeding.

21

1    This agreement is effective upon signature by defendant and

2   an Assistant United States Attorney.

3   AGREED AND ACCEPTED

4   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA

5
    DEBRA W. YANG
6   United States Attorney

7                                                    3/14/05

8   ANDREW STOLPER                              Date
    Assistant United States Attorney

9

10   I have read this agreement and carefully discussed every

11  part of it with my attorney.  I understand the terms of this

12  agreement, and I voluntarily agree to those terms.  My attorney

13  has advised me of my rights, of possible defenses, of the

14  Sentencing Guideline provisions, and of the consequences of

15  entering into this agreement.  No promises or inducements have

16  been made to me other than those contained in this agreement.  No

17  one has threatened or forced me in any way to enter into this

18  agreement.  Finally, I am satisfied with the representation of my

19  attorney in this matter.

20

21

22                                                   3/14/05

23  ALLEN JOHNSON                              Date
    Defendant

24

25   I am ALLEN JOHNSON's attorney.  I have carefully discussed

26  every part of this agreement with my client.  Further, I have

27

28                              22

1  fully advised my client of his rights, of possible defenses, of

2  the Sentencing Guidelines' provisions, and of the consequences of

3  entering into this agreement.   To my knowledge, my client's

4  decision to enter into this agreement is an informed and

5  voluntary one.

6

7  _____            3/14/05
                                          Date

8  JAMES RIDDETT
   Counsel for Defendant
   ALLEN JOHNSON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              23

## CERTIFICATE OF SERVICE BY MAIL

1

2   I, **SONIA ARMENTA**, declare:  That I am a citizen of the

3   United States and resident or employed in Orange County,

4   California; that my business address is United States Attorney's

5   Office, 411 West Fourth Street, Suite 8000, Santa Ana, California

6   92701; that I am over the age of eighteen years, and am not a

7   party to the above-entitled action;

8   That I am employed by the United States Attorney for the

9   Central District of California, who is a member of the Bar of the

10   United States District Court for the Central District of

11   California, at whose discretion the service by mail described in

12   this Certificate was made; that on <u>March 14, 2005</u>, I deposited in

13   the United States Mails, United States Attorney's Office, 411

14   West Fourth Street, Suite 8000, Santa Ana, California 92701 in

15   the above-entitled action, in an envelope bearing the requisite

16   postage, a copy of:

17   **PLEA AGREEMENT FOR DEFENDANT ALLEN JOHNSON**
     addressed to:

18

19   **SEE ATTACHMENT**

20   at their last known address, at which place there is a delivery

     service by United States Mail.

21
     This Certificate is executed on <u>March 14, 2005</u>, Santa Ana,

22
     California.  I declare under penalty or perjury that the

23
     foregoing is true and correct.

24

25   Sonia Armenta

26

27

28

104

1          **SERVICE LIST**

2

3      3 IMPERIAL PROMENADE #750
       SANTA ANA, CA. 92707-5903

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28