DECLARATION OF MICHAEL CARDWELL

I, Michael Cardwell, declare:

1. I make this declaration at the request of attorney H. Dean Steward to clarify the employment of Ken Ketner. I was president of Automated Financial Transaction (AFT) when I offered Mr. Ketner a job upon his release to a halfway house in June or July 2010. At the time, AFT had contracted with various residential lenders to perform what the industry commonly called Broker Price Opinions (BPO's). Mr. Ketner had extensive experience in the real estate industry and his primary function was to do the field inspection work required to complete the BPO's in Los Angeles, Orange, Riverside and San Bernardino Counties.

2. Those contracts expired in California in February of 2011. AFT continued Mr. Ketner's employment after that date, as he made efforts to grow other segments of our business.

3. To the best of my knowledge I have never spoken with anyone related to Mr. Ketner's federal probation. However, I was aware of it at all times. I did speak to someone from his orange county halfway house, confirming Mr. Ketner's job and his status while he was under their supervision.

4. Mr. Ketner and I had conversations about how difficult of a time he was having financially and his need to make more money to pay his financial obligations. He also mentioned that his brother

/

1  Karl Ketner was pressing him to pay an obligation to the IRS that
2  Ken said he had nothing to do with. I was also experiencing a
3  difficult time financially based on the collapse of the real estate
4  industry and property values in Arizona.
5  5. While Mr. Ketner was incarcerated, I had purchased some
6  convertible debt of a small public company from a business
7  associate of mine. That transaction was profitable. I was
8  approached by the same individual who sold me the debt in early
9  2011 to buy another portion of a convertible note. I discussed the
10 opportunity with Mr. Ketner, as I did not have the financial
11 capability to complete the transaction. Mr. Ketner had numerous
12 friends with money that I had been introduced to over the years, so
13 I asked him to look for an investor to help me with this deal.
14 6. Mr. Ketner later reported back that he was having a difficult
15 time finding an investor, based on his recent release from federal
16 custody. He told me that this only chance to secure a short term
17 investment for this transaction was to ask Mr. Ketner's friend Paul
18 Olivera. At that time I was in the process of forming a Wyoming
19 Corporation, Holiday Group Inc., which I used for this venture. At
20 my direction Mr. Ketner approached Mr. Olivera to discuss his
21 interest level regarding the loan. I had a previous negative
22 financial experience with Mr. Olivera and was not sure how that
23 would effect this situation. Mr. Ketner reported back to me that
24 Mr. Olivera was interested but wanted to have a discussion about
25 the structure of the loan and some personal issues that Mr. Olivera
26 was having. During that discussion Mr. Olivera informed me that his
27 health was in decline (Mr. Olivera died of heart failure in
28 2013) and that his family was involved in all of his business

1  transactions at that point. Mr. Olivera committed to making
2  available the funds to assist in the above referenced transaction
3  but made a request that, due to our previous problem, he would
4  prefer that the loan documents be signed by someone other than me
5  so that he would not have to explain the reasons for making the
6  loan to his family.
7  7. Mr. Ketner and I discussed the situation and alternative methods
8  to secure the funds necessary to acquire the above referenced note.
9  I asked Mr. Ketner as an employee of AFT, if he would approach his
10 brother Karl to see if he had interest in becoming involved in the
11 Holiday Group Inc. As an incentive to Mr. Ketner, I agreed that if
12 the transaction was profitable, I would increase his salary and
13 give him a bonus on his monthly check. The agreement with Ken's
14 brother Karl, as I understand it, was that Karl would receive a
15 monthly fee for being the President of the Holiday Group Inc. In
16 addition, if the note transaction was profitable, Karl would
17 receive a portion of the profits and he could spend his portion of
18 the profits as he saw fit.
19 8. Holiday Group, Inc. was incorporated March 9th of 2011 by Gerald
20 Pitts on behalf of Wyoming Corporate Services. Karl Ketner was not
21 involved in the actual incorporation of the company. I gave Ken
22 Ketner $500.00 in cash to open the Holiday account, and it is my
23 understanding that he acquired a money order in that amount and
24 that the money order was sent to Mr. Pitts, per his instructions to
25 legally open the corporation checking account in late March of
26 2011. By that time Karl Ketner had agreed to become president of
27 Holiday Group Inc. and became involved in the company.
28

9. Ken Ketner did have the checks for Holiday Group, Inc. and as an employee of mine at AFT, he worked with Karl Ketner to pay the necessary expenses related to the corporation. That was logistically the easiest as both of them were located in California.

10. Mr. Ketner had introduced me to Thomas Russell, a California attorney in 2011. I retained Mr. Russell to work on various ventures that I was involved in. Mr. Ketner worked closely with Mr. Russell while he was employed by AFT.

11. The convertible debt transaction was completed in August or September of 2011. Unfortunately, based on market conditions, the venture turned-out to be about break-even. I had limited or no involvement with the Holiday Group Inc. after October 2011, except for a conversation with Mr. Ketner, related to attorney Thomas Russell's involvement with that corporation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 1-3-2014

Michael Cardwell

-4-

# CONSENT TO ACTION WITHOUT A MEETING OF THE BOARD OF DIRECTORS
## OF
### Holiday Group, Inc.
### A Wyoming Corporation

In accordance with the Provisions of the Wyoming Business Corporation Act, Gerald Pitts on behalf of Wyoming Corporate Services, Inc., the original Director of Holiday Group, Inc., a Wyoming Corporation, hereby consents to the following action:

**RESOLVED** that, Graham Norris, is hereby appointed as Director of Holiday Group, Inc., to serve until a successor is duly elected and qualified.

**FURTHER RESOLVED** that the Director, Graham Norris, shall have full power and authority to act on behalf of Holiday Group, Inc..

**RESOLVED FURTHER**, that Graham Norris, is hereby authorized to Manage, control, and operate any portion of the business with such being but not limited to: any and all lawful business transactions; the opening a bank account in the name of this entity for the deposit of funds belonging to the company, such funds to be withdrawn by authorized parties.

**FURTHER RESOLVED** that I, Gerald Pitts, on behalf of Wyoming Corporate Services, Inc., an original Director of Holiday Group, Inc., a Wyoming Corporation, hereby tender and submit my resignation as a director of any and all positions with the above named company, such resignation to be effective this 9th day of March 2011.

**IN WITNESS WHEREOF**, the undersigned has executed this Written Consent as of the date hereof.

DATED this 9th day of March 2011.

_____
Gerald Pitts, Director

March 14, 2011

Subject: Bank Application

Attached please find the Wells Fargo Bank information for your company. Please complete the application and return it to our office. Along with the application you will need to include: a $500 check made payable to your company for the opening deposit of business checking plus a $500 check payable to your company for a business savings. You must also go to your local Wells Fargo Bank branch and have a profile setup on you. Upon receipt of the application and deposit, we will forward these documents to Wells Fargo for processing.

Feel free to contact our office at 1-800-990-0433 should you have any questions or need assistance with the completion of this application.

Sincerely,
Therese M. Hoard
Wyoming Corporate Services, Inc.
1-800-990-0433